630 A.2d 1145

**Tina Smedley REED et al.**

v.

**Mary CAMPAGNOLO et al.**

**Misc. No. 1, Sept. Term, 1993.**

Court of Appeals of Maryland.

Sept. 17, 1993.

Diane M. Janulis (Roy B. Cowdrey, Jr., Robert M. Messick, Jr., Cowdrey, Thompson & Karsten, PA, all on brief), Easton, for appellant.

Angus R. Everton (Diane S. Deros, Mason, Ketterman, and Morgan, Stanford H. Franklin, Gary S. Mandel, Franklin and Schapiro, all on brief), Baltimore, for appellee.

228

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

RODOWSKY, Judge.

This case of alleged medical malpractice comes to us from the United States District Court for the District of Maryland, pursuant to the Maryland Uniform Certification of Questions of Law Act (the Act), Md.Code (1974, 1989 Repl.Vol.), §§ 12–601 through 12–609 of the Courts and Judicial Proceedings Article (CJ). The certified questions are:

"i. Whether the State of Maryland recognizes a tort cause of action for wrongful birth when the doctor does not inform the patient about an available diagnostic test which might reveal the possibility of neural tube defects of the fetus, when these defects are genetically caused, when further diagnostic testing would be required to determine the nature and extent of any fetal defects, and when the plaintiff asserts she would have aborted the child had she been made aware of the fetus's deformities.

"ii. Whether the continuation of a pregnancy is a decision requiring the informed consent of the patient which can give rise to a Maryland tort cause of action for lack of informed consent when the allegedly negligent course of treatment is the defendant physician's failure to inform a pregnant patient about the availability, risks and benefits of diagnostic testing which might reveal birth defects, and failure to inform the patient about the benefits and risks associated with aborting a severely deformed fetus."

*Reed v. Campagnolo,* 810 F.Supp. 167, 172–73 (D.Md.1993).

Under the Act, this Court considers "only questions of state law, not questions of fact." *Mercantile–Safe Deposit & Trust Co. v. Purifoy,* 280 Md. 46, 54, 371 A.2d 650, 655 (1977). We will not "evaluate or weigh the evidence, but instead [will] accept the statement of facts submitted by the certifying court." *Food Fair Stores v. Joy,* 283 Md. 205, 219 n. 7, 389 A.2d 874, 882 n. 7 (1978). The Act " 'does not

authorize [this Court] to go beyond the questions certified in the order of the certifying court.' " *Toll v. Moreno,* 284 Md. 425, 437, 397 A.2d 1009, 1015 (1979) (quoting *Krashes v. White,* 275 Md. 549, 557, 341 A.2d 798, 802 (1975)); *see also Public Serv. Comm'n v. Highfield Water Co.,* 293 Md. 1, 10, 441 A.2d 1031, 1035 (1982).

Plaintiffs, Tina Smedley Reed and Frederick E. Reed, seek damages against defendants, Mary Campagnolo, M.D. and Bruce Grund, M.D. Defendants rendered prenatal care to Mrs. Reed and her unborn child at a Caroline County Health Department maternity clinic beginning in January 1986, the third month of Mrs. Reed's pregnancy.[1]

The essence of the Reeds' allegations are

"that defendants failed in the course of pre-natal care to 'inform plaintiffs of the existence or need for routine [α-fetoprotein] ("AFP") testing of maternal serum to detect serious birth defects such as spina bifida and imperforate anus.' Had they been informed about AFP testing they would have requested it. Had such testing been done, it would have revealed elevated protein levels, indicative of an abnormal fetus, which would have led plaintiffs to request amniocentesis. Amniocentesis, claim plaintiffs, would have revealed the extent of the fetus's defects and plaintiffs ultimately would have chosen to terminate the pregnancy."

*Reed,* 810 F.Supp. at 169 (references to complaint omitted).

"The parties agree Mrs. Reed was never informed about AFP testing, a procedure which reveals abnormal levels of

[1]. The appellees' brief advises that the physicians, in consideration of scholarship assistance through the National Health Service Corporation Program of the United States Public Health Service, entered into employment contracts with Caroline Health Services, Inc., a private, non-profit, health service organization. Caroline Health Services, Inc. in turn had contracted with the Maryland State Department of Health and Mental Hygiene to provide physicians to serve as consultants in the Caroline County Health Department maternity clinics. Mrs. Reed presented at one of these clinics. Brief of Appellees at 3–4.

proteins produced by the fetus. Abnormal protein levels may indicate genetically caused neural tube defects, including spina bifida. This test must be performed between weeks 16 and 18 of the pregnancy to obtain reliable results."

*Id.* (footnotes omitted).

"The [Reeds'] child, Ashley Nicole, suffers from a variety of genetically caused abnormalities, including meningomyelocele (spina bifida), hydrocephaly, imperforate anus, and ambiguous genitalia. The infant also has only one kidney, a fistula connecting her bladder and intestines, and increased head circumference, which required the insertion of a cerebral-abdominal shunt after birth."

*Id.* at 168 (references to complaint omitted).

In August 1989 the plaintiffs and Ashley Nicole made claim through the Health Claims Arbitration Office under the Maryland Health Care Malpractice Claims Act, CJ §§ 3–2A–01 through 3–2A–09. Thereafter, the parties waived arbitration, *see* CJ § 3–2A–06(A), and in February 1991 the plaintiffs filed their complaint with the United States District Court.

Initially that complaint contained three counts, described by the federal court as follows:

"Count I (Wrongful Birth) alleges negligent failure to inform the parent plaintiffs about the existence, benefits, and risks of AFP testing, amniocentesis, and abortion of a severely deformed fetus, and negligent failure to recognize and evaluate the signs and symptoms of an abnormal pregnancy.

"Count II (Lack of Informed Consent) alleges failure to inform the parent plaintiffs about the various risks of birth defects, testing procedures for birth defects, and the option of aborting a severely deformed fetus.

"Count III (Third Party Beneficiary Maintenance After Age of Majority) alleges a duty owed to all plaintiffs, including the baby, to inform about risk of birth defects,

tests available to detect defects, and the option of abortion of a severely deformed fetus."

*Reed,* 810 F.Supp. at 169.

The plaintiffs subsequently abandoned Count III, which the federal court had read as undertaking to allege "a cause of action for wrongful life." *Id.* at 169.

I

■ The first certified question asks whether the claim alleged in Count I of the complaint states a cause of action under Maryland law. The allegations undertake to state what has been called a "wrongful birth" claim. W.P. Keeton, *Prosser & Keeton on the Law of Torts* § 55, at 370 (5th ed. 1984), succinctly states the background and context of this theory of liability.

"The last couple of decades have witnessed the rapid development of tort claims concerning a variety of issues that arise when the tortfeasor's act or omission results in the birth of an unwanted child. The defendants in these cases are typically doctors charged with negligence in failing directly to prevent the conception or birth of the child, as by negligently performing a sterilization or abortion procedure, or in failing to diagnose or inform the parents that the child might be born deformed—because of a disease contracted by the mother or a genetic condition in one of the parents— in time to permit the termination of the pregnancy. These actions are now generally referred to as 'wrongful birth' claims, when brought by the parents for their own damages, and 'wrongful life' claims, when brought by or on behalf of the child for the harm of being born deformed."

(Footnote omitted).

The issue presented by the first certified question is whether the claim is simply a traditional negligence claim, as the Reeds contend, or whether the claim fails to withstand traditional tort analysis, as the defendants contend. If the latter, then the defendants submit that this Court should not recog-

nize it as a new tort, but rather should defer to the General Assembly.

In *Jones v. Malinowski,* 299 Md. 257, 473 A.2d 429 (1984), we affirmed a judgment entered against a physician who, when undertaking to perform a bipolar tubal laparoscopy, misidentified the left Fallopian tube and cauterized the wrong structure. *Id.* at 260, 473 A.2d at 430. Citing numerous cases, we recognized as "well accepted" the proposition "[t]hat there is a cause of action in tort based upon traditional medical malpractice principles for negligence in the performance of a sterilization procedure." *Id.* at 263, 473 A.2d at 432. There the unplanned pregnancy resulted in the birth of a normal child. The principal issue in *Jones* was the measure of damages. We concluded that the trier of fact would be permitted "to consider awarding damages to parents for child rearing costs to the age of the child's majority, offset by the benefits derived by the parents from the child's aid, society and comfort." *Id.* at 270, 473 A.2d at 435. We thus recognized that there could be compensable injury to parents when a child is born as a result of medical negligence.

In the case now before us the alleged negligence of the physicians occurred after Mrs. Reed was pregnant and consists of a failure to offer or perform certain tests that "would have revealed the severe and irreversible birth defects of" Ashley Nicole. Brief of Appellants at 8, Complaint ¶ 28. The plaintiffs then aver that "[r]easonably prudent prospective parents in similar circumstances, faced with the knowledge of severe birth defects such as those described above would have seriously considered and ultimately chosen termination of pregnancy at a stage safe to the mother." *Id.,* Complaint ¶ 31.

Although *Jones v. Malinowski* is not directly controlling, we shall apply here the same "traditional medical malpractice principles for negligence" analysis that was applied there. 299 Md. at 263, 473 A.2d at 432.

"[T]he burden of proof in a malpractice case is on the plaintiff to show a lack of the requisite skill or care on the part of the physician and that such want of skill or care was

a direct cause of the injury. . . . General rules of negligence apply to malpractice cases, as well as to ordinary claims of negligence. Therefore, 'to constitute actionable negligence, there must be not only causal connection between the negligence complained of and the injury suffered . . . but it must be the proximate cause.' "

*Suburban Hosp. Ass'n v. Mewhinney,* 230 Md. 480, 484–85, 187 A.2d 671, 673 (1963) (quoting *State ex rel. Kalives v. Baltimore Eye, Ear & Throat Hosp.,* 177 Md. 517, 527, 10 A.2d 612, 616 (1940)); *see also Johns Hopkins Hosp. v. Genda,* 255 Md. 616, 620, 622, 258 A.2d 595, 598, 600 (1969). Simply put, have we here a duty, a breach of that duty, and an injury proximately caused by the breach?

There is no dispute that the defendant physicians owed a duty of care to Mrs. Reed.

"[A] physician is under a duty to use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which he belongs, acting in the same or similar circumstances. Under this standard, advances in the profession, availability of facilities, specialization or general practice, proximity of specialists and special facilities, together with all other relevant considerations, are to be taken into account."

*Shilkret v. Annapolis Emergency Hosp.,* 276 Md. 187, 200–01, 349 A.2d 245, 253 (1975); *see also Nolan v. Dillon,* 261 Md. 516, 534, 276 A.2d 36, 46 (1971); *Anderson v. Johns Hopkins Hosp.,* 260 Md. 348, 350, 272 A.2d 372, 373 (1971); *Johns Hopkins Hosp. v. Genda,* 255 Md. 616, 620, 258 A.2d 595, 598 (1969).

That duty, initially, also applied to the unborn child. *See Group Health Ass'n v. Blumenthal,* 295 Md. 104, 453 A.2d 1198 (1983) (action for wrongful death of non-viable fetus, born alive, allowed); *State ex rel. Odham v. Sherman,* 234 Md. 179, 198 A.2d 71 (1964) (action for wrongful death in utero allowed); *Damasiewicz v. Gorsuch,* 197 Md. 417, 79 A.2d 550 (1951) (post-birth action for in utero injury allowed).

Subsidiary to the concept of duty is whether, under the particular circumstances of the instant matter, the standard of care was violated. The defendant physicians contend that it was not, but that is a matter of proof that is not before us on these certified questions. If the applicable standard of care required that the AFP and amniocentesis tests be offered or performed, that standard was violated, because it is undisputed that the tests were not offered or performed.

If the standard of care contended for by the Reeds had been fulfilled by the defendant physicians, and if Mrs. Reed had determined to terminate the pregnancy by abortion because of genetic defects revealed by the tests, then the defendants', or any successor or consulting physicians', common law duty of care to the unborn child would have been overridden by the former Maryland abortion statute.[2] At the time of the negligence alleged here, that statute provided in relevant part:

> "A physician licensed by the State of Maryland may terminate a human pregnancy or aid or assist or attempt a termination of a human pregnancy if said termination takes place in a hospital accredited by the Joint Commission for Accreditation of Hospitals and licensed by the State Board of Health and Mental Hygiene and if one or more of the following conditions exist:
>
> . . . .
>
> "(3) There is substantial risk of the birth of the child with grave and permanent physical deformity or mental retardation . . . ."

Md.Code (1982, 1990 Repl.Vol.), § 20–208(a) of the Health–General Article (HG).[3]

---

**2.** For purposes of this case it is sufficient to treat the eugenic portion of the former statute as valid and severable from constitutional defects in other portions.

**3.** Former HG § 20–208 was repealed and reenacted by Chapter 1 of the Acts of 1991. The comparable reenacted section, now Md.Code (1992 Cum.Supp.), HG § 20–209(b) in relevant part reads:

"Except as otherwise provided in this subtitle, the State may not interfere with the decision of a woman to terminate a pregnancy:

The links in the chain of causation alleged by the Reeds, if supported by the evidence and believed by the trier of fact, constitute proximate cause. The first link in. that chain, the alleged failure of the defendants to advise concerning the availability in the medical community of AFP testing and its purpose, connected to the next link, requiring a fact-finding that the testing would have been done, and so forth, through to abortion, present a form of proximate cause reasoning that is analogous to that applied in informed consent cases. *See Sard v. Hardy,* 281 Md. 432, 450–51, 379 A.2d 1014, 1024–25 (1977). Plaintiffs in these cases must prove causation in the sense that they must convince the fact finder that they would in fact have acted as alleged, had the information concerning testing been made available.[4] In the instant matter the Reeds have alleged this causal nexus.

We now consider legal injury. The clear majority of courts that has considered the type of medical malpractice case alleged by the Reeds has concluded that there is legally cognizable injury, proximately caused by a breach of duty. *See Robak v. United States,* 658 F.2d 471 (7th Cir.1981) (applying Alabama law); *Phillips v. United States,* 508 F.Supp. 544 (D.S.C.1981) (applying South Carolina law); *Lininger v. Eisenbaum,* 764 P.2d 1202 (Colo.1988); *Garrison v. Medical Center of Delaware, Inc.,* 581 A.2d 288 (Del.1990); *Haymon v. Wilkerson,* 535 A.2d 880 (D.C.1987); *Kush v.*

---

(1) Before the fetus is viable; or

(2) At any time during the woman's pregnancy, if:

. . . .

(ii) The fetus is affected by genetic defect or serious deformity or abnormality."

Chapter 1 of the Acts of 1991 was petitioned to referendum pursuant to Article XVI of the Constitution of Maryland. *See Kelly v. Vote Know Coalition,* 331 Md. 164, 626 A.2d 959 (1993). Chapter 1 was approved by a vote of 1,114,377 "For" and 690,542 "Against." *See* Report of the State Board of Canvassers on file with the State Administrative Board of Election Laws.

**4.** The allegations in the instant matter describe the plaintiff-parents as acting in agreement. By referring generally to this unity of action we do not imply that the father and mother of the unborn must always agree.

*Lloyd,* 616 So.2d 415 (Fla.1992); *Moores v. Lucas,* 405 So.2d 1022 (Fla.Dist.Ct.App.1981); *Blake v. Cruz,* 108 Idaho 253, 698 P.2d 315 (1984); *Siemieniec v. Lutheran Gen. Hosp.,* 117 Ill.2d 230, 111 Ill.Dec. 302, 512 N.E.2d 691 (1987); *Arche v. United States,* 247 Kan. 276, 798 P.2d 477 (1990); *Viccaro v. Milunsky,* 406 Mass. 777, 551 N.E.2d 8 (1990); *Proffitt v. Bartolo,* 162 Mich.App. 35, 412 N.W.2d 232 (1987); *Smith v. Cote,* 128 N.H. 231, 513 A.2d 341 (1986); *Berman v. Allan,* 80 N.J. 421, 404 A.2d 8 (1979); *Becker v. Schwartz,* 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807 (1978); *Jacobs v. Theimer,* 519 S.W.2d 846 (Tex.1975); *Naccash v. Burger,* 223 Va. 406, 290 S.E.2d 825 (1982); *Harbeson v. Parke–Davis, Inc.,* 98 Wash.2d 460, 656 P.2d 483 (1983); *James G. v. Caserta,* 175 W.Va. 406, 332 S.E.2d 872 (1985); *Dumer v. St. Michael's Hosp.,* 69 Wis.2d 766, 233 N.W.2d 372 (1975). *Contra Atlanta Obstetrics & Gynecology Group v. Abelson,* 260 Ga. 711, 398 S.E.2d 557 (1990); *Wilson v. Kuenzi,* 751 S.W.2d 741 (Mo.1988); *Azzolino v. Dingfelder,* 315 N.C. 103, 337 S.E.2d 528 (1985).[5]

Although the majority of courts addressing the issue has recognized the form of medical malpractice asserted by the Reeds, those courts are not in agreement on the measure of damages. The certified questions do not ask this Court to define the measure of damages. For the purpose of answering the first certified question, it is sufficient to state that there is at least some economic harm to the parents in these cases—a harm that can be quantified under the general rules relating to tort damages. *See Phillips v. United States,* 508 F.Supp. at 551 ("While it would be premature to demarcate the ultimate limits of 'wrongful birth' damages at this stage in

---

**5.** A number of states prohibit by statute an action based on a claim that, but for the act or omission of another, a person would not have been permitted to be born alive, but would have been aborted. *See* Idaho Code § 5–334 (1990) (legislating the opposite result from that reached in *Blake v. Cruz,* 108 Idaho 253, 698 P.2d 315 (1984)); Minn.Stat. § 145.424, Subd. 2 (1984) (constitutionality upheld in *Hickman v. Group Health Plan, Inc.,* 396 N.W.2d 10 (Minn.1986)); Mo.Rev.Stat. § 188.130, Subd. 2 (1986); Pa.Cons.Stat.Ann., tit. 42, § 8305(a) (Supp. 1993); Utah Code Ann. § 78–11–24 (1992).

the litigation, '[b]ecause at least some damages are cognizable at law, the motion for judgment on the pleadings may not be granted for lack of damages.'" (Citation omitted)).

The principal contentions of the defendant physicians turn on how one conceptualizes the tort alleged by the Reeds. Highly relevant to that consideration are the observations by the Supreme Judicial Court of Massachusetts concerning the terminology, "wrongful life," "wrongful birth," and "wrongful conception."

> "These labels are not instructive. Any 'wrongfulness' lies not in the life, the birth, the conception, or the pregnancy, but in the negligence of the physician. The harm, if any, is not the birth itself but the effect of the defendant's negligence on the [parents] resulting from the denial to the parents of their right, as the case may be, to decide whether to bear a child or whether to bear a child with a genetic or other defect."

*Viccaro v. Milunsky,* 551 N.E.2d at 10 n. 3.

The defendants' basic argument is that the Reeds have not suffered any legally cognizable injury. The argument adopts the analysis of the majority of the Supreme Court of North Carolina in its four-three decision in *Azzolino v. Dingfelder,* 377 S.E.2d 528. That court said:

> "Courts which purport to analyze wrongful birth claims in terms of 'traditional' tort analysis are able to proceed to this point [*i.e.,* injury] but no further before their 'traditional' analysis leaves all tradition behind or begins to break down. In order to allow recovery such courts must then take a step into *entirely untraditional analysis* by holding that the existence of a human life can constitute an injury cognizable at law. Far from being 'traditional' tort analysis, such a step requires a view of human life previously unknown to the law of this jurisdiction. We are unwilling to take any such step because we are unwilling to say that life, even life with severe defects, may ever amount to a legal injury."

337 S.E.2d at 533–34. *See also Atlanta Obstetrics & Gynecology Group v. Abelson,* 398 S.E.2d at 560–63 (applying *Azzoli-*

*no* analysis); J. Bopp et al., *The "Rights" and "Wrongs" of Wrongful Birth and Wrongful Life: A Jurisprudential Analysis of Birth Related Torts,* 27 Duq.L.Rev. 461 (1989).

The *Azzolino* analysis does not recognize even the economic impact on the parents and, in that respect, is contrary to Maryland law. In *Jones v. Malinowski* we replied to an argument similar to that advanced by the defendant physicians here when we said:

"We reject the proposition that as a matter of law and public policy no legally cognizable claim for child rearing damages can ever arise in such cases where the unplanned child is born normal and healthy. . . . That the public policy of Maryland may foster the development and preservation of the family relationship does not, in our view, compel the adoption of a per se rule denying recovery by parents of child rearing costs from the physician whose negligence has caused their expenditure. In other words, it is not to disparage the value of human life and the societal need for harmonious family units to protect the parents' choice not to have children by recognizing child rearing costs as a compensable element of damages in negligent sterilization cases. We, therefore, decline to follow the majority rule of those jurisdictions which have held that in all cases, without regard to the circumstances, the benefits to the parents from the birth of a healthy child always outweigh child rearing costs and thus result in no injury or damage to the parents. Instead, we align ourselves with those jurisdictions which permit the trier of fact to consider awarding damages to parents for child rearing costs to the age of the child's majority, offset by the benefits derived by the parents from the child's aid, society and comfort."

299 Md. at 269–70, 473 A.2d at 435.

Thus, those courts that recognize the cause of action alleged by the Reeds permit, at a minimum, damages measured by the extraordinary cost, at least through minority, of supporting the child with severe birth defects as compared to supporting a child who is not so afflicted. *See Lininger v. Eisenbaum,*

764 P.2d at 1206–07; *Garrison v. Medical Center of Delaware, Inc.*, 581 A.2d at 290; *Haymon v. Wilkerson*, 535 A.2d at 886; *Kush v. Lloyd*, 616 So.2d at 424; *Siemieniec v. Lutheran Gen. Hosp.*, 111 Ill.Dec. at 317–18, 512 N.E.2d at 706–07; *Arche v. United States*, 798 P.2d at 481; *Viccaro v. Milunsky*, 551 N.E.2d at 11; *Smith v. Cote*, 513 A.2d at 349–50; *Jacobs v. Theimer*, 519 S.W.2d at 849–50; *Naccash v. Burger*, 290 S.E.2d at 830; *Harbeson v. Parke–Davis, Inc.*, 656 P.2d at 974; *James G. v. Caserta*, 332 S.E.2d at 882; *Dumer v. St. Michael's Hosp.*, 233 N.W.2d at 377. These courts are not in agreement as to the period of time over which the extraordinary expenses are projected. In *Berman v. Allan*, the New Jersey Supreme Court rejected damages based on extraordinary support expenses, but allowed damages for the parents' emotional distress. 404 A.2d at 14–15. Other courts allow both economic and emotional damages. *See, e.g., Naccash v. Burger*, 290 S.E.2d at 830–31; *Harbeson v. Parke–Davis, Inc.*, 656 P.2d at 496–97. We cite these authorities not for the purpose of defining or refining a measure of damages in these cases, but simply to demonstrate that there is legally cognizable injury to the parents in these cases.

The defendant physicians also suggest that they cannot be liable because they have not caused the impairments suffered by Ashley Nicole. This argument espouses the view advanced by the dissenting judge of the New York Court of Appeals in *Becker v. Schwartz*, 413 N.Y.S.2d at 904, 386 N.E.2d at 816:

> "The heart of the problem in these cases is that the physician cannot be said to have caused the defect. The disorder is genetic and not the result of any injury negligently inflicted by the doctor. In addition it is incurable and was incurable from the moment of conception. Thus the doctor's alleged negligent failure to detect it during prenatal examination cannot be considered a cause of the condition by analogy to those cases in which the doctor has failed to make a timely diagnosis of a curable disease. The child's handicap is an inexorable result of conception and birth."

That analysis was also adopted in the plurality opinion announcing the judgment of the Supreme Court of Missouri in *Wilson v. Kuenzi*, 751 S.W.2d at 744-46.

We do not agree, because this argument takes too narrow a view of proximate or legal cause. Under Restatement (Second) of Torts § 431 (1965), an actor's negligent conduct is a legal cause if it is "a substantial factor" and if no rule of law relieves the actor from liability because of the manner in which the negligence resulted in harm. Even though the physical forces producing Ashley Nicole's birth defects were already in operation at the time of the alleged negligence of the physicians, under the chain of causation alleged by the Reeds the physicians could have prevented the harm to the parents. Those allegations, if proved, would present sufficient evidence from which the trier of fact could find that the alleged negligence of the physicians was a substantial factor in the legal harm to the parents. *See* Restatement (Second) of Torts § 302, comment c.

In argument before this Court, counsel for the defendants also presented an "over utilization" argument. The submission is that, faced with the possibility of liability in these cases, physicians will order tests for which there is no medical justification, and that this form of defensive medicine will become so widespread that it would create the appearance of the standard of care. Obviously, whether the defendants should have offered or recommended certain tests to Mrs. Reed is a matter for proof at trial. Further, although we acknowledge a general public interest in medical cost containment, that public interest, as currently manifested in cost containment legislation, is not a prohibition against legally recognized medical malpractice actions.

For the foregoing reasons, the answer to the first certified question is that Maryland does recognize the tort cause of action therein described.

## II

The second certified question is directed to that count of the Reeds' complaint which casts their allegations in the

mold of a lack of informed consent action. The Reeds, emphasizing that they were not told by the defendants about AFP and amniocentesis tests, say that they lacked informed consent. But one's informed consent must be to some treatment. Here, the defendants never proposed that the tests be done. Whether the defendants had a duty to offer or recommend the tests is analyzed in relation to the professional standard of care. Application of that standard may or may not produce a result identical with the informed consent criterion of what reasonable persons, in the same circumstances as the Reeds, would want to know.

The leading case in this Court on informed consent, *Sard v. Hardy*, 281 Md. 432, 379 A.2d 1014 (1977), discusses the doctrine only in the context of some treatment proposed by the health care provider. We said that doctrine

"follows logically from the universally recognized rule that a physician, treating a mentally competent adult under non-emergency circumstances, cannot properly undertake to perform surgery or administer other therapy without the prior consent of his patient. In order for the patient's consent to be effective, it must have been an 'informed' consent, one that is given after the patient has received a fair and reasonable explanation of the contemplated treatment or procedure."

*Id.* at 438–39, 379 A.2d at 1019 (citations omitted). The opinion in *Sard* continued:

"Simply stated, the doctrine of informed consent imposes on a physician, before he subjects his patient to medical treatment, the duty to explain the procedure to the patient and to warn him of any material risks or dangers inherent in or collateral to the therapy, so as to enable the patient to make an intelligent and informed choice about whether or not to undergo such treatment.

"This duty to disclose is said to require a physician to reveal to his patient the nature of the ailment, the nature of the proposed treatment, the probability of success of the contemplated therapy and its alternatives, and the risk of

unfortunate consequences associated with such treatment. The law does not allow a physician to substitute his judgment for that of the patient in the matter of consent to treatment."

*Id.* at 439–40, 379 A.2d at 1020 (citations omitted). We spoke of promoting "the paramount purpose of the informed consent doctrine—to vindicate the patient's right to determine what shall be done with his own body and when." *Id.* at 444, 379 A.2d at 1022.

The commentators similarly speak of informed consent in the context of a doctor's affirmative act. *See* F. Harper, E. James & O. Gray, *The Law of Torts* § 17.1, at 562 (2d ed. 1986); W.P. Keeton, *Prosser & Keeton on the Law of Torts* § 32, at 189–90 (5th ed. 1984); M. Shiffman, *Medical Malpractice: Handling General Surgery Cases* § 1.21, at 21–22 (1990); 4 S. Speiser, C. Krause & A. Gans, *The American Law of Torts* § 15:71, at 635 (1987); M. McCafferty & S. Meyer, *Medical Malpractice Bases of Liability,* ch. 11 (1985).

New York courts have held that to state a cause of action in informed consent requires an affirmative act by the doctor. In *Karlsons v. Guerinot,* 57 A.D.2d 73, 394 N.Y.S.2d 933 (N.Y.App.Div.1977), the plaintiffs contended that the defendant doctors' failure to inform the plaintiffs of the risks involved with the mother's pregnancy, including the risk that she would give birth to a deformed child, gave rise to "a cause of action for failure to obtain an informed consent to continuation of the pregnancy and to the final delivery." *Id.* at 81, 394 N.Y.S.2d at 938. The court held:

"[A] cause of action based upon [the doctrine of informed consent] exists only where the injury suffered arises from an affirmative violation of the patient's physical integrity and, where nondisclosure of risks is concerned, these risks are directly related to such affirmative treatment. Here, the resultant harm did not arise out of any affirmative violation of the mother's physical integrity. Furthermore, the alleged undisclosed risks did not relate to any affirmative treatment but rather to the condition of pregnancy

itself. Allegations such as these have traditionally formed the basis of actions in medical malpractice and not informed consent."

*Id.* at 82, 394 N.Y.S.2d at 939 (citation omitted); *see also Keselman v. Kingsboro Medical Group,* 156 A.D.2d 334, 335, 548 N.Y.S.2d 287, 288–89 (1989); *Etkin v. Marcus,* 74 A.D.2d 633, 633, 425 N.Y.S.2d 165, 165–66 (1980).

*Karlsons* was applied to the facts in *Pratt v. University of Minn. Affiliated Hosps. & Clinics,* 414 N.W.2d 399 (Minn. 1987). There parents sought genetic testing because the third of their three children suffered from multiple, congenital abnormalities. The defendants non-negligently advised the parents "that their chance[s] of conceiving another child with birth defects were about the same as parents in general." 414 N.W.2d at 400. Thereafter the plaintiffs had their fourth child who also suffered from birth defects. It was held that there was no liability on a theory of negligent nondisclosure for failure to advise of alternate possible causes of the third child's anomalies so that the parents "could make an informed decision on whether to conceive another child." *Id.* at 401.

To support their informed consent argument, the Reeds submit:

"Defendants fail to recognize that there was indeed something for the Reeds to consent to, *i.e.,* forgoing maternal serum AFP testing, amniocentesis, and an elective abortion in the face of knowledge (which would have been acquired through those tests) that the fetus was severely impaired and would be born, if at all, with serious birth defects."

Brief of Appellants at 28. In other words, the premise is that the defendants were under an obligation to advise that the tests be done. Whether there was an obligation to recommend the tests is the standard of care issue that is to be determined by the evidence.

What the Reeds seek is a rule that the appropriate tests for predictive genetic counseling will be determined by what reasonable persons, similarly situated to the plaintiffs, would want to know. But the rule cannot focus exclusively on the

plaintiff.  A fair rule would have to look at all of the possible tests that might be given and evaluate the reasons for excluding some and perhaps recommending one or more others. That approach requires expert testimony.

One commentator well stated the overview:

"Counseling about genetic risks in reproduction has traditionally occurred after the birth of a family's first child with a genetic disorder.  Increasingly, however, reproductive counseling involves predictive 'diagnosis' based upon risk factors, rather than upon the appearance of a genetically impaired child in the family.  The development of more sophisticated biochemical and cytogenetic tests for assaying amniotic fluid and maternal and fetal blood has also significantly enhanced the importance of the reproductive counseling aspect of medical genetics.  As is true for other kinds of diagnosis, the process of reproductive counseling is strewn with opportunities for missteps.  First, there is the need to possess and employ expert knowledge, a matter that would be determined according to professional standards.  The physician must understand enough about the patient's apparent condition to obtain proper clinical and laboratory tests and to gather relevant facts through a medical, and perhaps a family, history.  It is as necessary to discern the correct tests as to perform them properly.  Moreover, small differences in diagnostic results may be crucial in determining the medical condition involved and in recognizing whether it is classified as a 'genetic disorder.' "

A.M. Capron, *Tort Liability in Genetic Counseling,* 79 Colum.L.Rev. 618, 626 (1979) (footnotes omitted).

For the foregoing reasons, our answer to the second question is in the negative.

CERTIFIED QUESTIONS ANSWERED AS ABOVE SET FORTH.  COSTS TO BE EVENLY DIVIDED BETWEEN THE PLAINTIFFS AND THE DEFENDANTS.