707 A.2d 933

Jacqueline JOHNSON, a Minor, etc., et al.

v.

ROWHOUSES, INC.

No. 730, Sept. Term, 1997.

Court of Special Appeals of Maryland.

April 3, 1998.

---

580

Suzanne C. Shapiro (Saul E. Kerpelman, on the brief), Baltimore, for appellants.

David L. Feldstein (Thomas J. Cullen, Jr., Joseph E. Dever and Goodell, DeVries, Leach & Gray, L.L.P., on the brief), Baltimore, for appellee.

Argued before WENNER, SALMON and THIEME, JJ.

SALMON, Judge.

This case involves an allegation that Jacqueline Johnson (Jacqueline), a minor, suffered damage to her central nervous system as a result of deteriorated lead-based paint at premises

located at 2523 Emerson Avenue in Baltimore City ("the Emerson Avenue premises" or "the premises"). The principal issue to be resolved is one of causation, viz: whether plaintiffs could prove that the minor plaintiff's residence at the premises between October 26, 1990, and April 1, 1991, was a "substantial factor" in causing injury to Jacqueline. Judge David B. Mitchell, after holding a hearing concerning this issue, ruled that plaintiffs could not prove causation and, accordingly, granted summary judgment in favor of defendant/appellee, Rowhouses, Inc. Plaintiff/appellant Tyese Green, individually and as mother and next friend of Jacqueline, filed this timely appeal.

## I. BACKGROUND FACTS [1]

Jacqueline was born on January 15, 1987. Her mother is Tyese Green (Ms. Green). In July 1990, when Jacqueline was three and one-half years old, Ms. Green and Jacqueline moved to the Emerson Avenue premises. She lived there with Gertrude MacDonald, a family friend, until April 1, 1991.

Appellee, Rowhouses, Inc., purchased the Emerson Avenue premises on March 1, 1990, from the Bee Holding Company. Bee Holding Company rented the premises to Gertrude Mac-Donald sometime in 1983. Ms. Green paid rent to Ms. Mac-Donald and never dealt, either directly or indirectly, with Rowhouses, Inc.

On September 13, 1990, Jacqueline's blood was tested for lead poisoning at the outpatient clinic of Mercy Medical Center. The lead in her blood was reported at 51 micrograms per deciliter of blood. A normal blood-lead level is 10 (micrograms per deciliter) or less. Jacqueline was retested on October 11, 1990, and her lead level had risen to 59. She was admitted at Mercy as an in-patient and was given chelation therapy. When she was discharged from the hospital on

---

1. The facts are set forth in this opinion in the light most favorable to plaintiffs/appellants. Defendant/appellee disputes some of these facts.

October 26, 1990, Jacqueline's blood-lead level had been reduced to 32 micrograms per deciliter.

On October 24, 1990, the Baltimore City Health Department issued Rowhouses, Inc., an "Emergency Lead Paint Nuisance Violation" for the Emerson Avenue premises, which cited 47 areas of the home as containing lead-based paint. The notice stated that the condition was dangerous and detrimental to health and life and that removal of all chipping and flaking lead-based paint was required by November 23, 1990.

Jacqueline, after her October 26, 1990, discharge, returned to live at the Emerson Avenue premises. She lived there uninterruptedly until April 1, 1991. During this period of approximately five months, Rowhouses, Inc., did not correct the hazardous lead-paint condition at the premises. Jacqueline's blood-lead levels were tested on four occasions in this five-month interim. Her lead levels, expressed in micrograms per deciliter, were: 30 on November 16, 1990; 33 on December 11, 1990; 30 on February 24, 1991; and 27 on March 7, 1991.

After Jacqueline moved from the premises, her blood-lead levels were tested on five occasions. Her results, again expressed in micrograms per deciliter, were: 23 on June 20, 1991; 27 on August 1, 1991; 23 on October 29, 1991; 30 on December 4, 1991; and 33 on December 11, 1991.

Ms. Green, individually and on behalf of Jacqueline, filed a complaint in the Circuit Court for Baltimore City against Rowhouses, Inc., on June 30, 1994. Count I of the complaint alleged, *inter alia,* that Rowhouses, Inc., had been negligent in

> failing to exercise reasonable care in properly maintaining the walls, doors, and ceiling [on the premises] and in failing to undertake suitable means to eradicate the ... danger caused by the flaked condition of the paint after knowledge, both actual and constructive on the part of the said [d]efendant.

Count I sought damages on behalf of Jacqueline; Count II requested damages for medical expenses and loss of services on behalf of Ms. Green, individually. Rowhouses, Inc., filed an

answer to the complaint. Later, counsel for Rowhouses, Inc., deposed Dr. David James, who was plaintiffs/appellants' sole causation expert.

## Dr. James's Deposition

Jacqueline's I.Q. (intelligence quotient) was tested after her chelation therapy. Her full scale I.Q. was 84, which put her in the low-normal range. Dr. James, a pediatrician, testified that studies have shown that for every ten micrograms per deciliter of lead a child has in his or her blood, that child has a decrease in I.Q. of two to three points. Dr. James was of the opinion that Jacqueline was exposed to lead-based paint while she lived at the Emerson Avenue premises and that this exposure, independent from "any other cause," caused injury to Jacqueline. Based on the aforementioned formula, he estimated that Jacqueline had lost from eight to twelve I.Q. points due to her exposure to lead paint at the premises. In Dr. James's opinion, Jacqueline would have performed better at school and in her daily activities if she had not experienced this drop in I.Q.

Counsel for appellee asked Dr. James if, considering Jacqueline's blood-test results from October 26, 1990, to December 11, 1991, it was "fair to say" that after chelation therapy she did not have "significant exposure" to lead. Dr. James replied, "I don't think I can make that statement." He was then asked:

Take the lead level you have on June 20, '91 and let's stop there, and that's a 23. Is it fair to say from the results you see, just taking the June '91, acting as if that's the last result, that it appears that from chelation to that date there does not appear to be any significant re-exposure or continued exposure to lead during that period of time?

Dr. James answered:

It does not appear to be, although I don't think you can be a hundred percent certain about that.

Appellee's counsel and Dr. James then had the following exchange:

Q. But from looking at it now, you can say it doesn't appear that there was significant continued or re-exposure to lead during that time period?

A. That's correct.

Q. Now you go on after that and the last level you have is December '91, is that correct?

A. That's correct.

Q. And from the evidence you've reviewed and the records you've received you don't have any additional evidence of lead levels after that date?

A. I don't have. There may be, but I don't have them.

On cross-examination, counsel for appellants asked Dr. James to assume that the Emerson Avenue premises were not repaired and continued to have deteriorated lead paint from the end of October 1990 to April 1, 1991, and to further assume that Jacqueline lived in the premises during this period. Making those assumptions, counsel then asked if he had an opinion to a reasonable degree of medical probability as to whether her residence at the Emerson Avenue premises "contributed" to her elevated lead level during that period. Dr. James did have an opinion, which was, "[I]t did contribute to her elevated blood lead levels." Dr. James was next asked:

I think you testified earlier that her blood lead level actually went down during that time. If she was placed in an environment that was free of lead hazards, would you have an opinion based on a reasonable degree of medical probability whether her blood lead level would have been lower?

Dr. James's answer was:

I think that that question is hard to answer. It could have been lower or it could have remained about the same. It depends on what burden of lead she had in her body tissues. I do not believe I can answer that question.

On re-direct examination, defense counsel attempted to underscore the last-quoted answer. The attempt backfired,

and he received a different answer. Dr. James and appellee's counsel engaged in the following colloquy:

Q. In talking about exposure during the time period after the chelation occurred in October 1990 through April '91, Mr. Mensch [appellants' counsel] asked you a question which you said you could not answer. Let me ask you this question. Is it fair to say that it's impossible to tell if this child was continually exposed to lead at this address or if these levels were the result of leaching from the bones or previous exposure during that time period?

[APPELLANTS' COUNSEL]: During this six-month time period after the discharge from the hospital, Tom?

[APPELLEE'S COUNSEL]: Yes.

A. If the child was in an environment where there had been no de-leading, if there is still lead there, I would assume that she's continuing to be exposed and that she is continuing to take in more lead into her system. If she is exposed in a house that has multiple lead violations, I would think that she would be continually taking lead into her system.

Appellee's counsel moved for summary judgment against appellants. In that motion, Rowhouses, Inc., contended, as to the negligence counts, that appellants could not prove that appellee had notice of the lead-paint hazard at the Emerson Avenue premises. Citing *Richwind Joint Venture 4 v. Brunson*, 335 Md. 661, 679–82, 645 A.2d 1147 (1994), movant pointed out that plaintiffs were required to prove that the owner of the premises had "specific knowledge that lead-based paint [was] on the premises in question and that it was in a deteriorated condition." Appellants, on March 6, 1997, responded by pointing out, as to the negligence counts, that the Baltimore City Health Department notified Rowhouses, Inc., of the lead-paint hazard on October 24, 1990, but Rowhouses, Inc., failed to abate the hazard prior to the date Jacqueline moved from the premises. On March 14, 1997, Rowhouses, Inc., filed a reply to appellants' response. In its response, Rowhouses, Inc., revised its theory as to why it was entitled to

summary judgment on the negligence counts. It asserted, for the first time, that appellants could not prove that Jacqueline suffered any injury due to exposure to lead-based paint between October 24, 1990 (date of notice from the Baltimore City Health Department) and April 1, 1991 (date when Jacqueline and her mother vacated the premises).

The motion for summary judgment was initially heard on Monday, March 17, 1997, before Judge Mitchell. Appellee's counsel said that he had hand-delivered to plaintiffs/appellants a copy of Rowhouses, Inc.'s, response on March 14, 1997, which was the Friday before the hearing. Appellants' counsel, however, said that she had been "out of town taking depositions" until the afternoon of March 17th and had not seen the latest filing by Rowhouses, Inc. Appellants' counsel maintained:

> [W]e should have 15 days to respond when they attach new evidence, which they did, by deposition testimony or affidavit. The rules require it's considered a new motion and we have 15 days to respond.

Time was of the essence in deciding the motions because trial in the matter was set to commence on March 27, 1997. Judge Mitchell asked appellants' counsel to review Rowhouses, Inc.'s, response and advise him by March 19, 1997, whether plaintiffs/appellants needed additional time to respond. He told counsel he would then decide whether an additional hearing was necessary. Counsel for appellants wrote to Judge Mitchell on March 18, 1997, and said, in pertinent part:

> In order to properly address this issue, I must review the one hundred plus page transcript of Dr. James' deposition. At the present time I do not have a copy of this transcript and need to order it from the reporter. Moreover, it may be necessary to further discuss this issue with Dr. James.

Appellee's counsel wrote to Judge Mitchell on March 20, and appellants' counsel responded to that letter on March 21, 1997. Appellants' counsel concluded her March 21 missive by saying:

> Here, the [d]efendant chose to raise additional issues and attach additional supporting testimony in its reply memo-

randum. As such, under the Maryland Rules, the [p]lain-tiffs are entitled to fifteen (15) days to present facts to the Court disputing this additional evidence.

Out of compliance with the Maryland Rules, and fairness to the minor [p]laintiff, [p]laintiffs request fifteen (15) additional days from the date the [d]efendant filed its Reply Memorandum to submit a memorandum to the Court disputing this additional evidence.

Before Judge Mitchell could rule on appellants' counsel's request for a full fifteen days to file a memorandum, appellants, on March 24, 1997, filed a response to appellee's revised summary judgment motion to which plaintiffs/appellants attached a copy of Dr. James's deposition. Included in appellants' March 24th reply was the averment that Dr. James had said in his deposition "within a reasonable degree of medical probability that the exposure [between October 1990 and April 1, 1991] contributed to Jacqueline Johnson's elevated blood lead levels and resulting injuries." Appellants asked for a hearing on the motion.

Promptly upon receipt of appellants' response to the revised motion for summary judgment, the court set the motion in for hearing on March 25, 1997. In oral argument, prior to the court's ruling on the summary judgment motion, appellants' attorney did not ask the court for additional time to respond to the motion or to file an affidavit. Instead, counsel argued that, based on Dr. James's deposition testimony, a jury question was presented as to whether Jacqueline's exposure to lead-based paint at the premises between October 26, 1990, and April 1, 1991, was a substantial factor in causing her injury. Judge Mitchell, in granting summary judgment in favor of Rowhouses, Inc., ruled that: (1) Rowhouses, Inc., did not have notice of the existence of lead-based paint at the Emerson Avenue premises prior to October 24, 1990; (2) Rowhouses, Inc., did have notice of deteriorated lead-based paint on the premises in the five-month period between October 24, 1990, and April 1, 1991; (3) Rowhouses, Inc., had failed to abate the lead-paint hazard during the five-month period when Jacqueline lived at the Emerson Avenue premises after

her discharge from Mercy Medical Center; but (4) appellants had failed to show they could connect any injury to Jacqueline to the existence of lead-based paint at the Emerson Avenue premises during the aforementioned five-month period.

Immediately after the court's oral ruling, counsel for appellants complained that she earlier had asked for, but had not been given, "the full amount of time under the Maryland Rules to adequately respond to the . . . causation issue" raised by Rowhouses, Inc., for the first time on March 14, 1997. She therefore argued:

> I believe that granting the summary judgment based on that issue that I have not met this substantial factor test is inappropriate based on the fact that I have not had adequate time to address this with Dr. James and obtain an affidavit to that standard. And therefore, I want it to be very clear for the record that I feel that an error has been made in not allowing substantial time or the minor plaintiff time in order to review this properly.

Judge Mitchell pointed out: (1) that in the past year he had come to know appellants' counsel; (2) that during his acquaintance, appellants' counsel had never "been backward about coming forward to holler when you're hurt"; and (3) that, before the hearing (of March 25, 1997) began, appellants' counsel did not complain that she needed additional time to answer the motion for summary judgment. He thus impliedly found that counsel's complaint was an afterthought designed to seek advantage rather than to right a wrong.

Appellants did not file any post-hearing motions nor did they file a post-hearing affidavit from Dr. James or any other expert. Appellants did file this timely appeal and raise two questions, viz:

I. Did the motions judge commit a prejudicial error of law in not allowing [a]ppellants fifteen days to respond to the additional issue of proximate cause supported by additional evidence, raised by the [a]ppellee for the first time in a reply memorandum, before granting [a]ppellee's motion for summary judgment?

II. Did the motions judge err in ruling on Summary Judgment that the record lacks legally sufficient evidence to permit a factfinder to conclude that the landlord's negligent act, in failing to correct the deteriorated lead hazard once it received notice of the hazard from the Baltimore City Health Department, was a proximate cause of injury to the minor [p]laintiff?

## ISSUE I

Appellants correctly point out that appellee did not raise any causation issue in its initial motion for summary judgment. Up until March 14, 1997, appellee's only argument as to the negligence counts was that appellants could not prove that appellee had notice of the lead-based paint hazard at the Emerson Avenue premises. On March 14, 1997, appellee first raised the causation issue.

Appellants contend, and we agree, that the March 14, 1997, filing constituted a revised motion for summary judgment raising a new ground as to why summary judgment should be granted. *See Davis v. Goodman,* 117 Md.App. 378, 390–91, 700 A.2d 798 (1997).

Maryland Rule 2–311(b) reads:

Response. Except as otherwise provided in this section, a party against whom a motion is directed shall file a response within 15 days after being served with the motion, or within the time allowed for a party's original pleading pursuant to Rule 2–321(a), whichever is later.... If a party fails to file a response required by this section, the court may proceed to rule on the motion.

Citing Rule 2–311(b), appellants argue that the court should have treated appellee's March 14, 1997, filing as "a new motion for summary judgment and granted the [a]ppellants 15 days to respond to the additional issue of causation...." There would be great merit in this argument if appellants had filed no response to the revised motion for summary judgment within fifteen days. But, as already noted, appellants filed a response to the revised motion for summary judgment on

March 24, 1997—ten days after appellee's revised motion was served on appellants' counsel. In appellants' response to the revised motion for summary judgment, appellants did not ask for additional time to respond.[2] Instead, they (1) argued in their response that Dr. James's deposition testimony did show that Jacqueline's exposure during the five-month post-notice period proximately caused her injury and (2) asked for a hearing.

Once appellants responded to the revised motion for summary judgment, the issue of how much time they should have been given to respond was mooted. Put another way, when an opposing party responds early to a summary judgment motion and in the response does not indicate that any additional response time is needed, the court is justified in deciding the motion forthwith. Appellants' request for more response time made after they had already lost the motion for summary judgment plainly was made too late.

Moreover, even if we were to assume, *arguendo*, that the court should have given appellants additional time to file an affidavit, there is nothing in the record to show that Dr. James was willing to sign an affidavit stating that a substantial factor in Jacqueline's injury was her exposure to lead between October 24, 1990, and April 1, 1991. Appellants' counsel, after Judge Mitchell granted summary judgment, indicated that she had not at that point even talked to Dr. James about the causation issue. Additionally, at no time prior to the filing of this appeal did appellants make a proffer as to what Dr. James would have said if additional time had been granted. In a civil case, in order to win on appeal, an appellant must show not only error but that the error was

---

2. Significantly, appellants did not follow Rule 2–501(d), which provides:

**Affidavit of Defense Not Available.**—If the court is satisfied from the affidavit of a party opposing a motion for summary judgment that the facts essential to justify the opposition cannot be set forth for reasons stated in the affidavit, the court may deny the motion or may order a continuance to permit affidavits to be obtained or discovery to be conducted or may enter any other order that justice requires.

prejudicial. *Bradley v. Hazard Tech. Co.*, 340 Md. 202, 206, 665 A.2d 1050 (1995). Here, appellants have shown no prejudice and hence have shown no reversible error was committed by the court's failure to allow appellants until March 29, 1997, to file an additional response to appellee's motion.

## ISSUE II

### Standard of Review

■ Maryland Rule 2–501 provides in pertinent part:

Any party may file at any time a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law.... The response to a motion ... shall identify with particularity the material facts that are disputed.... The court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law.

Md. Rule 2–501(a), (b), and (e) (1993). Thus, a moving party must set forth sufficient grounds for summary judgment. Although the movant is not required to support his motion with an affidavit unless he files it "before the day on which the adverse party's initial pleading or motion is filed," *see* Md. Rule 2–501(a), he must support his various contentions by placing before the court facts that would be admissible in evidence *or otherwise detailing the absence of evidence in the record to support a cause of action. See Washington Homes, Inc. v. Interstate Land Dev. Co., Inc.,* 281 Md. 712, 716, 382 A.2d 555 (1978).

*Bond v. NIBCO,* 96 Md.App. 127, 134, 623 A.2d 731 (1993) (emphasis added).

■ Appellants' position in regard to Issue II is somewhat inconsistent with the position adopted as to Issue I. As to Issue II, appellants contend that Dr. James's deposition testimony showed that Jacqueline's exposure to lead-based paint at

the premises during her stay there for five months after her discharge from Mercy Medical Center was a substantial factor in causing her injury. If this had been true, appellants would not have needed the additional time they asked for after summary judgment was granted. We will nevertheless disregard this inconsistency and address the merits of this argument.

In its revised motion for summary judgment, appellee referred to the deposition of Dr. James and stated:

[G]iven the minor [p]laintiff's decreasing lead-levels [after the October 24, 1990, notification] and the testimony from [p]laintiffs' own expert that it does not appear that the minor [p]laintiff was exposed to lead during the post-notice period, [p]laintiffs have not and cannot prove that any exposure during this period was a substantial factor in proximately causing any injuries allegedly suffered by the minor [p]laintiff.

We said in *Bartholomee v. Casey*, 103 Md.App. 34, 56–57, 651 A.2d 908 (1994), *cert. denied*, 338 Md. 557, 659 A.2d 1293 (1995):

The "substantial factor" rule, embodied in the *Restatement (2d) Torts*, § 431, has been adopted in Maryland in a wide variety of factual contexts. *See, e.g., Reed v. Campagnolo*, 332 Md. 226, 239–40, 630 A.2d 1145 (1993) (physician's negligence can be a substantial factor in "causing" a wrongful birth); *Owens–Illinois v. Armstrong*, 326 Md. 107, 119, 604 A.2d 47 (1992) (plaintiff must show that products supplied by the defendant was a substantial factor in causing asbestosis); *Dominion Constr. Inc. v. First Nat'l Bank of Md.*, 271 Md. 154, 163, 315 A.2d 69 (1974) (drawer's negligence was a substantial factor in "causing" the forgery). Absent proof that a defendant's conduct was a substantial factor in causing the injuries, a defendant is entitled to judgment. *Prosser & Keeton*, § 41, at 267–70.

■ It is important to note that, under the test enunciated in *Bond*, 96 Md.App. at 134, 623 A.2d 731, once a defendant points out the absence of evidence needed by plaintiff to

support a cause of action, plaintiff must come forward to show that he (or she) has such evidence. That test, as applied here, means that, if Rowhouses, Inc., showed (by Dr. James's deposition testimony) the absence of evidence required to prove causation, the burden was upon appellants to show that they possessed evidence from which a jury could reasonably find that appellee's negligence was a substantial factor in causing Jacqueline harm. It was not appellee's burden to prove a negative, i.e., that no action or inaction on its part caused injury.

■ The issue of whether Jacqueline received injury due to her exposure to lead-based paint at the Emerson Avenue premises is one which requires the testimony of an expert. *Bartholomee*, 103 Md.App. at 59, 651 A.2d 908. In opposing summary judgment, appellants maintained that Dr. James's testimony supplied the needed expert testimony.

Dr. James's causation opinions, taken in the light most favorable to appellants, were four in number.

1. That Jacqueline's exposure to lead paint in the nine-month period from July 1990 to April 1991, when she lived at the Emerson Avenue premises, was an "independent" cause of her injury. This opinion, of course, does not suffice to prove causation here because appellee is only liable for the injury to Jacqueline between October 26, 1990, when she returned to the premises, and April 1, 1991 ("the five-month window").

2. Jacqueline's residence at the premises during the five month window "contributed" to her elevated blood-lead levels.[3] The issue of whether her exposure "contributed" to elevated blood-lead levels is, of course, different from the relevant issue of whether her exposure during the five-month window was a "significant factor" in causing injury. *See ACandS, Inc. v.*

---

**3.** This opinion is seemingly contradicted by Dr. James's other testimony that he could not say whether her post-chelation therapy blood-lead levels could have been higher or lower had she not been exposed to lead paint on the premises during the five-month window.

*Asner,* 104 Md.App. 608, 649, 657 A.2d 379 (1995), *rev'd in part on other grounds,* 344 Md. 155, 686 A.2d 250 (1996).

3. That, if one looked at Jacqueline's blood-lead levels for the thirteen-month period between October 26, 1990, and December 1, 1991, it was *not* fair to say that Jacqueline did *not* have "significant" exposure to lead. In regard to this opinion, it is important to note that during eight of the thirteen months embraced in that opinion Jacqueline did not live at the Emerson Avenue premises.

4. If one looked at the period between October 26, 1990, and June 20, 1991, it was "fair to say," although he could not be one hundred percent certain, that Jacqueline had no "significant" exposure or "significant" continued exposure to lead during that period.

During Dr. James's deposition, defense counsel and Dr. James had the following exchange:

Q. I think I asked you this earlier, but just to confirm, we understand you've reviewed these records. At this time you have no plans nor has anyone asked you to review anything else or do anything else to prepare to express your final opinions?

A. I have not been asked, no.

Q. Nor do you have any individual plans to do anything else?

A. Not at the present time.

Q. Now I would like to ask you for, first, a narrative and then I'll break it down. Could you state for the record the opinions you plan to express at the trial of this matter?

A. The opinions that I plan to express are as written in my report of April 19, 1996, as I have stated in the last paragraph of this report.

Q. Can I rely on this report dated April 19, '96, to include all the opinions you plan to express at trial of this matter?

A. Yes.

* * *

Q. But I want to make sure that I don't leave here today without gaining all the opinions that as it stands today that you plan to express at trial. Can I get on the plane this afternoon and fairly assume that I've done that?

A. Yes.

Nowhere in Dr. James's report did he express an opinion that Jacqueline's exposure during the five-month window was a significant factor in her injuries. In fact, Dr. James's written report does not even mention the five-month window. It focuses entirely on the ten-month period Jacqueline lived on the premises.

As already mentioned, appellants said in their response to appellee's revised motion for summary judgment that they could prove, by Dr. James's deposition, that Jacqueline's exposure to lead at the Emerson Avenue premises during the five-month window caused her injury. Unfortunately, appellants' proof failed in that regard. Dr. James's deposition, at best, shows that the five-month window of exposure to lead-based paint "contributed" to Jacqueline's elevated blood-lead level. Whether this contribution was a "substantial" cause of any injury to Jacqueline is a matter about which Dr. James did not express an opinion and, according to his deposition, did not intend to express an opinion. A jury would be left to speculate as to the causation issue. Speculation of this type would be especially risky in view of Dr. James's admission that it was "fair to say" that Jacqueline's exposure to lead-based paint in the period between October 26, 1990, and June 20, 1991, was probably insignificant. If we change the name of the minor plaintiff, what we said in *Bartholomee* is exactly on point:

[W]ithout expert testimony that exposure during this window, *by itself,* was a substantial causation factor of [Jacqueline's] lead poisoning, the jury [would have] to speculate as to the impact of exposure during that period....

*Bartholomee,* 103 Md.App. at 59, 651 A.2d 908.

Because appellants failed to demonstrate that they possessed proof that Rowhouses, Inc.'s, negligence was a substan-

tial cause of Jacqueline's injury, the trial court was legally correct in granting summary judgment in favor of appellee.

**JUDGMENT AFFIRMED; COST TO BE PAID BY APPELLANTS.**