14 A.3d 1244

Patricia WANTZ, et al.

v.

Rizwana AFZAL, et al.

No. 2300, Sept. Term, 2009.

Court of Special Appeals of Maryland.

March 1, 2011.

676

Paul D. Bekman (Emily C. Malarkey, Salsbury, Clements, Bekman, Marder & Adkins, LLC, on the brief), Baltimore, for appellant.

Amy Askew & Frederick W. Goundry, III (Shelley L. Bagoly, Varner & Goundry, on the brief), Frederick, for appellee.

Panel: JAMES R. EYLER, WOODWARD and HOTTEN, JJ.

EYLER, JAMES R., J.

Patricia Wantz, appellant, appeals from a judgment entered by the Circuit Court for Frederick County in favor of Rizwana Afzal and Donelson & Carnell, M.D., P.A. (collectively referred to as "appellees").[1] This case arose following the death of

---

1. There are issues in this case unique to each witness and/or party. Nevertheless, because this appeal is limited to the trial court's rulings precluding appellant's experts from offering causation testimony, and because the effects of such rulings on both Dr. Afzal and Donelson & Carnell, M.D., P.A. are substantially similar, we will refer to them collectively as "appellees."

appellant's mother, Evelyn Reynolds, caused by a staph infection developed at the site of spinal fusion surgery. Thereafter, appellant filed wrongful death and survival actions against the doctors, their related medical practices, and the hospital believed to be responsible for Ms. Reynolds's death, alleging that each was negligent in her care.

Before trial commenced, appellees filed several motions challenging the admissibility of testimony by three expert witnesses designated by appellant. Appellees asserted that none of the witnesses were qualified to express an opinion on issues of causation. Finding that all three of the expert witnesses were either unqualified or lacked a sufficient factual basis, or both, to offer expert testimony under Maryland Rule 5–702, the trial court granted appellees' motions. Thereafter, the court, recognizing that expert testimony on the issue of causation was necessary to survive a motion for judgment, and that appellant had no experts to testify on the issue of causation, granted appellees' motion for judgment.

Appellant filed a timely appeal, challenging the court's exclusion of her experts. After review, we conclude that the trial court abused its discretion in precluding appellant's witnesses from offering expert testimony, on the ground the witnesses lacked qualifications and a factual basis and, therefore, reverse the judgment and remand for further proceedings.

## Factual and Procedural Background

There was no evidentiary proceeding in circuit court. The motion papers were supported by the *de bene esse* deposition of one of the experts and discovery depositions of the other two experts, however, and additional materials were made part of the record at the hearing on the motions. The materials included curriculum vitae. The substantive "facts" are taken from pleadings, depositions, and argument of counsel.

On March 6, 2007, Evelyn Reynolds was taken by ambulance to the Emergency Department of Frederick Memorial

Hospital after she had fallen and injured her back. Ms. Reynolds, seventy-seven years old at the time of her fall, was suffering from osteopenia, a condition involving low bone mineral density, and ankylosing spondylitis, also known as "bamboo spine," which is a type of arthritis that affects the joints in the spine and pelvis. Ms. Reynolds was subsequently admitted to the hospital under the care of Hirenkumar (Hiren) Shah, M.D., an internist and professional partner of Mrs. Reynolds's primary care provider, Hemen Shah, M.D., in the practice of Donelson & Carnell, M.D., P.A.

Later that evening, Dr. Hiren Shah ordered a STAT CT pyelogram, which was read by Rizwana Afzal, M.D., a radiologist, as showing a small thoracoabdominal bleed. These results were reported to both Drs. Shah, along with Dr. Afzal's recommendation to both that a dedicated contrast-enhanced CT of the chest be performed.

Shortly thereafter, pursuant to Dr. Afzal's recommendation, Dr. Hiren Shah ordered a CT angiogram of the chest. This test, which was also interpreted by Dr. Afzal, showed a fracture of the T10 vertebra and a possible fracture of the T9 vertebra with associated hematoma and malalignment. The parties disagree as to whether the results of the CT angiogram were ever reported to Dr. Hiren Shah. Dr. Afzal, while testifying at a deposition, insisted that she verbally reported the fractures over the phone to Dr. Shah. She also testified that during that phone conversation, she discussed with Dr. Shah the importance of keeping Ms. Reynolds immobilized, to prevent her condition from worsening, and to perform an MRI. Conversely, Dr. Shah testified that he did not recall having this conversation with Dr. Afzal.

In any event, following the chest CT, neither Dr. Hiren Shah nor Dr. Hemen Shah ordered an MRI, or ordered that Ms. Reynolds be immobilized. The parties agree that between that time and March 9, 2007, Ms. Reynolds reported, at the very least, some back pain when she moved. In the early hours of March 9, 2007, Ms. Reynolds told the nurses that she had no feeling in her feet or legs. An ensuing MRI confirmed

that her condition had worsened. As a result, Ms. Reynolds was transferred to the University of Maryland Medical Center to undergo immediate spinal fusion surgery from T8 to L2. She never regained motor function below her waist.

On April 3, 2007, Ms. Reynolds developed an enterococcus and staphylococcal infection at her surgical site. Responsive surgery ultimately proved to be unsuccessful, and Ms. Reynolds died on July 30, 2007, as a result of the staph infection she developed in her spine.

On June 9, 2008, appellant, as Ms. Reynolds's surviving child, filed wrongful death and survival actions, individually and as personal representative of Ms. Reynolds's estate, against Dr. Hiren Shah, Donelson & Carnell, M.D., P.A. (for the actions of both Drs. Shah), Dr. Afzal, Emergency Physician Associates, P.A. ("E.P.A."), and Frederick Memorial Hospital. Following discovery, E.P.A. and Frederick Memorial Hospital were dismissed from the case. Prior to trial, the remaining parties entered into a stipulation whereby Dr. Hiren Shah was dismissed as a defendant and Donelson & Carnell, M.D., P.A. agreed that it would be vicariously liable for both Drs. Shah and its employees acting within the scope of their employment at the time of the events, if the jury were to find that either Dr. Shah was negligent.

The events giving rise to this appeal occurred shortly before trial, when appellees moved to strike or preclude the testimony of three of appellant's expert witnesses. The experts were Karl Manders, M.D., a board-certified neurosurgeon; Jeffrey Gaber, M.D., a board-certified internist and geriatric medicine specialist; and Gregg Zoarski, M.D., a board-certified radiologist.

The first motion sought to strike a *de bene esse* deposition of Dr. Manders. In pertinent part, Dr. Manders opined that immobilizing Mrs. Reynolds on March 6 would likely have prevented paralysis, and that without paralysis and the concomitant neurological deficit, the spinal fusion, through bracing or surgery, would likely have been successful. After reviewing Dr. Manders's deposition, the court granted appel-

lees' motion to strike, finding that he was not qualified and lacked a sufficient factual basis to provide this opinion.

Additionally, appellees moved in limine to preclude Dr. Gaber and Dr. Zoarski from offering expert testimony on causation. Based on a discovery deposition and proffers by counsel, it appears Dr. Gaber was expected to opine that paralysis was a likely cause of Ms. Reynolds's inability to heal following her spinal fusion surgery and, thus, a likely cause of the staph infection that ultimately caused her death. Based on a discovery deposition and proffers, it appears that Dr. Zoarski was expected to opine that the lack of immobilization following the second CT scan was a likely cause of paralysis.

The court granted appellees' motions, finding that, with respect to Dr. Gaber, he was unqualified and/or lacked a sufficient factual basis to offer the opinion for which he was proffered. With respect to Dr. Zoarski, the court found that he "eviscerate[d]" his own qualifications when he admitted that "[h]ow she's mobilized [sic] and the specifics of how that is done is not within my expertise."

Immediately following the court's ruling on appellees' last motion to exclude testimony, appellees moved for judgment pursuant to Maryland Rule 2–519. Ultimately, having stricken or precluded the testimony of each of appellant's designated expert witnesses regarding the issue of causation, the trial court granted appellees' motion. This appeal followed.

Additional facts will be incorporated as necessary to complete our discussion.

### Questions Presented

Appellant presents the following issues for our review:

1) Whether the trial court erred when it determined that Karl Manders, M.D., a board-certified neurosurgeon, was unqualified and lacked a sufficient factual basis to render opinions regarding the cause of Mrs. Reynolds' paralysis and her likelihood of recovery?

2) Whether the trial court erred when it determined that Jeffrey Gaber, M.D., a board-certified physician specializing

in internal and geriatric medicine, was unqualified or lacked a sufficient factual basis to opine on the cause of Mrs. Reynolds's paralysis and ultimate death?

3) Whether the trial court erred when it determined that Gregg Zoarski, M.D., a board-certified neuro- and interventional radiologist, was unqualified to testify that immobilization would have prevented Mrs. Reynolds' paralysis?

## Standard of Review

For our purposes, it is well-settled that "the determination by the trial court of the experiential qualifications of a witness will only be disturbed on appeal if there has been a clear showing of abuse of the trial court's discretion." *Rollins v. State*, 392 Md. 455, 500, 897 A.2d 821 (2006) (internal quotations and citations omitted). Indeed, the Court of Appeals has "often stated that the admissibility of expert testimony is a matter largely within the discretion of the trial court, and its action in admitting or excluding such testimony will seldom constitute a ground for reversal." *Bryant v. State*, 393 Md. 196, 203, 900 A.2d 227 (2006) (internal quotations omitted). "An appellate court will only reverse upon finding that the trial judge's determination was both manifestly wrong and substantially injurious." *Brown v. Contemporary OB/GYN Assocs.*, 143 Md.App. 199, 252, 794 A.2d 669 (2002) (citations omitted); *see also Pepper v. Johns Hopkins Hosp.*, 111 Md. App. 49, 76, 680 A.2d 532 (1996) ("The trial court's determination is reversible if it is founded on an error of law or some serious mistake, or if the trial court clearly abused its discretion.") (internal quotations omitted).

## Discussion

As stated above, our review is limited to whether appellants' three experts are qualified and have a sufficient factual basis to opine on causation issues. The court excluded all testimony on issues of causation, independent of the form and foundation for any particular question. We conclude that the experts are qualified to express opinions on causation issues as follows, but we express no opinion regarding the propriety of any particu-

lar question. That is because the court did not rule on specific questions, and it was impossible to do so with respect to Drs. Gaber and Zoarski, based on discovery depositions. Nevertheless, based on the materials in support of the motion papers and arguments and proffers of counsel, we are aware of the nature of the causation issues to be addressed. We express no opinion on standard of care issues.

### 1. *Maryland Rule 5–702*

Maryland Rule 5–702 governs the admissibility of expert testimony. It provides:

> Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

Md. Rule 5–702. Regarding the first requirement, concerning the witness's qualifications to offer expert testimony, a trial court should consider whether the expert has "special knowledge of the subject on which he is to testify that he can give the jury assistance in solving a problem for which their equipment of average knowledge is inadequate." *Radman v. Harold,* 279 Md. 167, 169, 367 A.2d 472 (1977) (quoting *Casualty Ins. Co. v. Messenger,* 181 Md. 295, 298, 29 A.2d 653 (1943)). This knowledge may be derived from "observation or experience, standard books, maps of recognized authority, or any other reliable sources," including "the experiments and reasoning of others, communicated by personal association or through books or other sources." *Id.* at 169–70, 367 A.2d 472. "[T]he mere fact that a person offered as a witness has not been personally involved in the activity about which he is to testify does not, as such, destroy his competency as an expert." *Id.* at 171, 367 A.2d 472 (allowing an internist to offer

an opinion regarding the performance of a hysterectomy even though he had never personally performed such a procedure).

Similarly, with respect to the third requirement,[2] there is a broad range of sources capable of forming the requisite factual basis. Indeed, the Court of Appeals has stated that "[a] factual basis for expert testimony may arise from a number of sources, such as facts obtained from the expert's first-hand knowledge, facts obtained from the testimony of others, and facts related to an expert through the use of hypothetical questions." *Sippio v. State*, 350 Md. 633, 653, 714 A.2d 864 (1998). In evaluating whether there is an adequate factual basis, the trial court operates within a wide discretionary range. *CSX Transportation, Inc. v. Miller*, 159 Md.App. 123, 199, 858 A.2d 1025 (2004).

Based on appellant's expected evidence, the causation issues can be summarized as follows: (1) had Ms. Reynolds been immobilized she would not have been paralyzed and may or may not have required spinal fusion surgery, and (2) if spinal surgery was necessary, the absence of paralysis likely would have resulted in the surgery being successful, and (3) a successful surgery likely would have prevented the onset of the ultimately fatal infection. With these in mind, we conclude that the witnesses are qualified and have, by virtue of their background and knowledge of matters pertinent to this case, a sufficient factual basis on which to opine on the issue of causation. The witnesses had substantial training and experience, over many years, and had reviewed materials pertinent to this case.

### 2. Dr. Manders

██ Appellant first challenges the court's decision to grant appellees' motion to strike the *de bene esse* deposition of Dr. Manders. Appellant argues that Dr. Manders's fifty-years of

2. Appellant states in her brief that 5–702(2) is not at issue. Appellees' briefs do not dispute the appropriateness of expert testimony on the particular subject, and we therefore need not address this subsection in our discussion.

experience in neurosurgery, his occasion to treat and immobilize patients with spinal fractures, and his regular consultations with orthopedists, radiologists, and internists, rendered him qualified to testify under Rule 5–702. Appellant argues that "[t]he trial court's conclusion that Dr. Manders was unqualified and lacked a sufficient factual basis to testify in this case was founded on the understanding that he never performed spinal fusion surgery or followed the post-operative course of patients who had undergone this surgery." To that point, appellant contends that the court's conclusion fails to consider the purpose for which appellant offered Dr. Manders' testimony. According to appellant, the thrust of Dr. Manders' testimony was that "immobilization and immediate surgery, as soon as the fractures were discovered, would have prevented Mrs. Reynolds' paralysis . . . [and] had she not been paralyzed at the time of surgery, her chances of success were good, but because she was, the fusion was unlikely to take." Therefore, appellant argues, his inexperience with performing spinal fusion surgery or following the post-operative course of patients who had undergone such surgery does not disqualify him from offering testimony regarding the pre-operative cause of paralysis.

In response, appellees observe that Dr. Manders testified that he had never performed the fusion aspect of spinal surgeries, had not practiced in several years, and could not recall an experience with a patient like the decedent. Appellees also argue that Dr. Manders admitted that he lacked the knowledge regarding "what impact, if any, the failure to immobilize had on Ms. Reynolds's outcome." Therefore, according to appellees, he was unqualified to offer expert testimony on the issue of causation.

Maryland law has long-recognized that a proposed medical expert "need not be a specialist in order to be competent to testify on medical matters," and qualify under Rule 5–702. *Ungar v. Handelsman*, 325 Md. 135, 146, 599 A.2d 1159 (1992) (internal quotations omitted). Indeed, in *Radman v. Harold*, the Court of Appeals distinctly rejected such a principle. 279 Md. at 169, 367 A.2d 472. In that case, the plaintiff attempted

to qualify an internist, who lacked specialty in gynecology and surgery, as an expert in order to establish that the defendant physician failed to perform a hysterectomy according to the appropriate standard of care. *Id.* at 167, 367 A.2d 472. The Court of Appeals, having determined that the trial court applied an erroneous legal standard in excluding the expert's testimony, stated:

> In light of the fact that we have never treated expert medical testimony any differently than other types of expert testimony, we perceive no reason why a person who has acquired sufficient knowledge in an area should be disqualified as a medical expert *merely* because he is not a specialist or *merely* because he has never personally performed a particular procedure.

*Id.* at 171, 367 A.2d 472 (emphasis in original). As a result, the Court concluded that the trial court abused its discretion in excluding the internist's testimony on the basis that he was an internal medicine specialist and not a gynecologist or surgeon. *Id.* at 176, 367 A.2d 472. *Cf. Air Lift, Ltd. v. Bd. of Co. Comm'rs*, 262 Md. 368, 402, 278 A.2d 244 (1971) (holding that "an experienced law enforcement officer who had never been personally involved in policing a rock festival or concert could nonetheless qualify as an expert witness and testify with respect to the security problems associated with such events"); *Rotwein v. Bogart*, 227 Md. 434, 437, 177 A.2d 258 (1962) ("A law professor may be an expert on trial procedure even though he has never tried a case. There are many expert astronauts who have yet to make a space flight.").

In *Wolfinger v. Frey*, the Court of Appeals dealt directly with the admissibility of expert testimony on the issue of causation. 223 Md. 184, 162 A.2d 745 (1960). In that case, the plaintiff sought to prove that a car accident "caused her cystitis and trigonitis to flare up, resulting in some pyelitis and a twenty per cent [sic] disability as a result of her chronic pyelits." *Id.* at 187, 162 A.2d 745. Responding to the defendant's argument that a general practitioner was unqualified to testify that the plaintiff's condition was exacerbated by the

kidney injury sustained as a result of the collision, the Court concluded:

> Because of the importance in this case of Dr. Bring's testimony, we may observe that we see no validity to a contention that unless he were a specialist in the medical field involved he could not testify to his opinion, basing it upon a case history and his examination of the injured person.

*Id.* at 189–90, 162 A.2d 745; *see also Samsun Corp. v. Bennett,* 154 Md.App. 59, 838 A.2d 381 (2003) (concluding that orthopedist, despite lack of specialty in the pertinent medical field, was qualified to offer expert testimony concerning the cause of plaintiff's erectile dysfunction following slip and fall accident).

In the case *sub judice,* while ruling on appellees' motion to strike Dr. Manders's testimony, the trial court reasoned:

> As I understand then, also then, ultimately the issue is paralysis. The point, the significance of the paralysis in Ms. Reynolds' case is, and I'll say it for purp, lack of better term, the argument of the, the position I should say, of the plaintiff is that had Ms. Reynolds not suffered from paralysis she then could have been up and around after surgery, which eventually was necessary. Uh, and that would accelerated, greatly enhanced was the term the plaintiff used properly, greatly enhanced her recovery because the, her spine would have fused more rapidly then it, then, uh, then it would if she's immobilized, that is she doesn't have the weight of, of the spine to assist in the fusion after the surgery was done.

> Dr. Manders has followed post operatively, and I'll accept for purposes of my decision many patients who have had dorsal spine surgery, he has followed them and he's been involved in that surgery because it's a very, anything involving the back is very sensitive because the spinal cord runs through the vertebra, uh, and we all know how significant the spinal cord is, and in this case what occurred was obviously that, I'm saying obviously, that's an assumption I

have to admit, but I'm assuming that what happened was that with the dislocation of the fractures and the vertebra the spinal cord was affected and the [sic] led to the paralysis. I think he could take a look at some film for example and come to that conclusion.

But he did not follow post operatively diffusing of the, uh, of the spine. And that's really what he's being called upon to talk about here. Uh, he's not being called upon to talk about, uh, post operative spinal cord injuries that had already occurred.

Those are the things that I take from the deposition, the deposition excerpts and the depositions that I've read, and it seems to me that based on those conclusions that I draw anyway that his factual basis is lacking because he is doing the on the one hand on the other hand it depends, and it's not very helpful to the jury, I think it is speculation. First of all as to that issue at the beginning whether there should have been surgery or immobilization, and second when it comes to the postoperative circumstances. He is not qualified as an orthopedist to talk about the fusing of the spine. He might be qualified in some regards if he were treating a patient, but not for purposes of trial. I don't think he has sufficient, uh, expertise to bring to bear on that subject so I'm going to grant the motion to strike the testimony of Dr. Manders.

To the extent the trial court excluded Dr. Manders's testimony on the basis that he was not qualified, we conclude that this constituted an abuse of discretion. Dr. Manders's expected testimony relates to the causal relationship between the failure to immobilize Mrs. Reynolds and her subsequent paralysis. In that regard, Dr. Manders testified on direct examination that he had experience treating patients with a T9–T10 fracture with preexisting osteopenia and immobilizing patients who have had a T9–T10 fracture. With over fifty years' experience in neurosurgery and spinal conditions, Dr. Manders possessed the requisite special knowledge, skill, and education of the subject that would enable him to assist the jury in evaluating appellant's claim that appellees' failure to

immobilize caused Mrs. Reynolds's paralysis. *Radman,* 279 Md. at 173, 367 A.2d 472; Md. Rule 5–702(1).

Moreover, insofar as Dr. Manders opined regarding the spinal fusion itself, he need not be "qualified as an orthopedist to talk about the fusing of the spine," as the cited authorities so hold. To the extent the court concluded otherwise, it erred.

Similarly, Dr. Manders's qualifications enabled him to opine that without paralysis and the concomitant neurological deficit, the fusion, whether through bracing or spinal surgery, would likely have been successful. The mere fact that Dr. Manders had never performed the actual vertebral fusion aspect of the surgery does not disqualify him from offering expert testimony. *See Radman,* 279 Md. at 171, 367 A.2d 472. In any event, Dr. Manders testified on cross-examination that he followed his patients post-operatively, albeit primarily from a neurologic rather than orthopedic standpoint. It follows that this experience, combined with his close work with orthopedic surgeons during and after spinal fusion surgeries, rendered him qualified to offer this opinion. *See Wolfinger,* 223 Md. at 189–90, 162 A.2d 745; *Samsun Corp.,* 154 Md.App. at 73, 838 A.2d 381.

Appellees cite *Univ. of Md. Med. Sys. v. Waldt,* 411 Md. 207, 983 A.2d 112 (2009) for the proposition that limited experience within a given field, combined with a "failure to provide specific scientific or factual underpinnings for any knowledge regarding [a given procedure]" falls short of the 5–702 requirements. While we agree with the principle, we perceive that case as inapposite. *Waldt* involved an expert who had very limited experience with the particular procedure performed by the defendant physician involving a neuroform stent, and therefore was not qualified to offer expert testimony regarding the appropriate level of informed consent for the procedure. *Id.* at 219, 983 A.2d 112. Conversely, in the case at bar, Dr. Manders testified that he had been involved with the neurological aspects of spinal fusion surgery and post-operative recovery, and had consequently worked closely with

and observed orthopedists perform the vertebral fusion aspect of the surgery.

 Lastly, appellees suggest that the fact that Dr. Manders was unable to personally opine as to whether Ms. Reynolds was ultimately going to require surgery, regardless of paralysis, is indicative of his lack of knowledge and expertise in the subject area. In that regard, appellees cite the following portion of Dr. Manders's *de bene esse* deposition:

Q. So if I understand what you're saying, is that as you sit here today, you don't have an opinion one way or the other which option was going to ultimately be required?

A. I would depend upon the rest of the team to tell me. If they told me, this is a real bad risk, then I would—I would not be aggressive on it.

Q. So if I understand your testimony, as you sit here today, you don't know whether or not she was ultimately going to require a fusion or if bracing would have been sufficient.

A. I am not—I wasn't, you know—no, I don't know basically the answer to that, because it depends on other factors that we don't have in the question right now.

The fact that Dr. Manders could not opine on this issue does not contravene our earlier conclusion that Dr. Manders was qualified to opine on the issues as discussed. Rather, this line of questioning indicates only that Dr. Manders could not be sure whether spinal fusion surgery was inevitable, regardless of paralysis, in light of Ms. Reynolds's preexisting conditions. It does not negate the merit of his opinion that the failure to immobilize, with or without surgery, caused her paralysis and that surgery, if performed, likely would have been successful, absent paralysis. While Dr. Manders's answers to questions on cross examination may be very effective in terms of his credibility before a jury, they do not disqualify him from testifying.

Certainly, though an expert is qualified, his opinion must still comport with the remaining subsections of Rule 5–702.

With respect to subsection (3), "an expert's opinion must be based on a[n] adequate factual basis so that it does not amount to conjecture, speculation, or incompetent evidence." *Giant Food, Inc. v. Booker*, 152 Md.App. 166, 182–83, 831 A.2d 481 (2003) (internal quotations and citation omitted). As noted above, a number of sources may provide the factual basis for expert testimony, including "facts obtained from the expert's first-hand knowledge, facts obtained from the testimony of others, and facts related to an expert through the use of hypothetical questions." *Sippio*, 350 Md. at 653, 714 A.2d 864.

Here, Dr. Manders's significant experience in neurosurgery, including a post–1992 focus on spinal conditions, combined with his review of Ms. Reynolds's medical records, provides a sufficient factual basis for his expert opinion regarding (1) the causal relationship between the failure to immobilize and her subsequent paralysis, and (2) the effect of the paralysis on her ability to recover from surgery.

### 3. Dr. Gaber

■ Next, appellant challenges the trial court's preclusion of Dr. Gaber from offering expert testimony at trial. Unlike Dr. Manders's *de bene esse* deposition, Dr. Gaber had not yet offered trial testimony, so our review must consider his qualifications and the questions he was likely to be asked at trial. In that regard, appellant argues that Dr. Gaber planned to opine that "patients whose bodies are weakened by paralysis fare poorer [in surgical recovery] than those who have complete neurologic function." He further planned to testify that since paralysis was a likely cause of Ms. Reynolds's inability to heal, it was a likely cause of her fatal staph infection. According to appellant, Dr. Gaber's testimony was to be limited accordingly, and he was not going to offer any opinions about the "treatment of spinal fusion patients in the immediate post-operative period." Consequently, appellant argues, "[a]s an internist who handles all different kinds of medical problems, Dr. Gaber [knows] the impact that paralysis can have on any patient's ability to function and recovery from surgery."

In response, appellees argue that Dr. Gaber, as an internist, is not qualified to offer expert testimony that a delay in treatment caused Ms. Reynolds's paralysis, or that the paralysis impacted her recovery and/or caused the staph infection. Appellees contend that Dr. Gaber's inexperience in treating spinal fractures and stabilizing spinal fractures, along with his inexperience in post-operative care and treatment of patients following spinal fusions, render him unqualified to opine on the those issues.

In its ruling excluding Dr. Gaber's testimony, the trial court explained:

Uh, he didn't, however, . . . talk specifically about any experience he had with a post surgical, post operative patient who was paralyzed, uh, again getting back to the, the idea that the point that he didn't articulate a factual basis for his opinion.

\* \* \*

In this case I think the given that Dr. Gaber does not have apparently or does not articulate this experience is not involved in the immediate, uh, in the post operative recovery. I think I have to grant the motion. Uh, I think that he is not, uh, whether, whether he's not qualified or lacks the, uh, a basis either way, uh, I don't understand any basis for him being able to give that opinion so I'm going to grant the motion.

\* \* \*

In this case, again I respect Dr. Gaber's probably just an excellent physician, but I don't think he has the particular expertise that's required under our rules and statute to give opinions for which he is being proffered in this case. So I'm going to grant the motion with regard to the issue that the paralysis resulted from the, uh, inadequate, inappropriate care that's alleged to have been given to Ms. Reynolds after she appeared at the hospital.

Thus, the exact reason for the court's ruling, whether on grounds of insufficient qualifications or insufficient factual basis, is not entirely clear. Similarly, it is unclear whether the

court's ruling was limited to Dr. Gaber's opinion on the cause of paralysis, or whether it referred to relevant causation opinions in general.

We assume the court excluded all causation opinions. We also assume the court ruled that Dr. Gaber was excluded under both Rule 5–702(1) and (3).

Regarding Dr. Gaber's qualifications as they relate to his probable testimony at trial, namely, that Ms. Reynolds's paralysis was a likely cause of her inability to heal and the resulting staph infection, appellant argues that Dr. Gaber was qualified to offer this opinion. Appellant cites portions of Dr. Gaber's discovery deposition where he testified that he regularly sees and treats patients with orthopedic problems, including osteopenia and ankylosing spondylitis. He also testified that he "get[s] very involved" in the postoperative care of patients following spinal surgeries. Thus, according to appellant, Dr. Gaber's significant experience in internal medicine, along with is history of treating patients with osteopenia and involvement with the post-operative treatment of patients following spinal surgery, renders him qualified to offer his opinion on causation.

Appellees primarily respond by highlighting that Dr. Gaber stated that he would defer to a neurosurgeon or spine surgeon on matters relating to the post-operative care of spinal fusion patients. They argue that "Dr. Gaber was unable to say whether, absent paralysis, Ms. Reynolds was likely to ever recover from her surgery[, and] therefore, did not know what, if any, role paralysis played in the outcome of this case." As a result, appellees argue, he was not qualified to opine on the effect of paralysis on Ms. Reynolds's recovery.

The pertinent passage from Dr. Gaber's deposition reads:

Q: What impact, if any, would the quality—and I don't think quality is going to be the right word, but if you understand me, let me know—the quality of Ms. Reynolds' spine absent the paralysis have on her ability to heal from the fusion or the fixation? If you don't understand, I can try to ask it again.

A: I understand.

Q: Or would you defer to a specialist?

A: So you asked what were the chances that given her preexisting spinal condition that she would have healed—

Q: Absent the paralysis.

A: —absent the paralysis with this type of surgery? I don't know that that would have made a difference. They only operated on the one segment that had been dislocated, so to speak, and she already had, from what they said, ankylosed, meaning autofused on her own, other segments on her spine and up and down, so they didn't need to do that. So I don't know that that would have made a difference.

Q: Would you defer to a neuorsurgeon or a spine surgeon?

A: Yeah, I think probably they might have a better opinion[.]

* * *

Q: Would you defer to a neuorsurgeon or a spine surgeon who would have performed the surgery as to the typical course of treatment and recovery period post surgery?

A: I'll answer it this way. I would certainly respect their opinions. I'm not a surgeon, but I've seen an awful lot of cases that have had fractures and spinal fusion. I've seen hundreds of them. So I have, you know, a reasonably good idea, even though I'm not the one doing the surgery.

We do not perceive this exchange to support the position that Dr. Gaber is not qualified to opine regarding the effect of paralysis on recovery from spinal fusion surgery. The fact that a neurosurgeon or spinal surgeon might have another opinion or better opinion does not disqualify the witness from expressing his opinion. Dr. Gaber testified that his extensive experience provided him with a reasonably good idea as to the typical course of treatment and post-operative recovery. This and information supplied to him entitles him to express an

opinion. As the Court of Appeals has previously stated, a doctor need not specialize in a particular area to offer an expert opinion in that field. *Radman,* 279 Md. at 171, 367 A.2d 472; *Air Lift, Ltd.,* 262 Md. at 402, 278 A.2d 244; *Wolfinger,* 223 Md. at 189–90, 162 A.2d 745. Many of Dr. Gaber's comments may be useful on cross examination, but they go the weight of his testimony.

Regarding Dr. Gaber's factual basis in support of his opinion, we conclude that his experience, as demonstrated through his discovery deposition and curriculum vitae, as well as his review of the pertinent medical records, creates the requisite basis necessary to offer the above stated opinion. As we stated with respect to Dr. Manders's testimony, "a factual basis for expert testimony may arise from a number of sources," *Sippio,* 350 Md. at 653, 714 A.2d 864, including personal experience and a review of the relevant medical records. Here, Dr. Gaber testified that he has seen hundreds of cases involving fractures and spinal fusions, and has been very involved in the post-operative care of such patients. Those experiences, therefore, combined with his general knowledge as an internist regarding the body, sepsis, and the impact of paralysis on surgical recovery, provide an adequate factual basis for which to opine about the impact of Ms. Reynolds's paralysis on her ability to heal from her spinal surgery.

Finally, we recognize that the trial court had difficulty finding testimony in Dr. Gaber's discovery deposition where he conclusively states "why paralysis would lead to [Mrs. Reynolds's inability to heal]," and that this difficulty seems to have ultimately led to the court's ruling. As stated above, Dr. Gaber's and Dr. Zoarski's depositions were discovery depositions. We cannot be certain at this point in time whether Dr. Gaber would be able to further develop this opinion at trial. However, considering that Dr. Gaber is an experienced internist, there certainly exists the possibility, if not probability, that Dr. Gaber has a sufficient medical basis for opining that paralysis negatively impacts a patient's ability to recover from surgery. This is a matter appropriate for exploration at trial,

at which time the court can more adequately determine whether there exists a sufficient factual basis for this opinion.

### 4. Dr. Zoarski

■ Finally, appellant argues that the trial court abused its discretion by granting appellees' motion in limine to preclude Dr. Zoarski from testifying that the failure to immobilize Mrs. Reynolds was a likely cause of her paralysis. In granting appellees' motion, the trial court found that Dr. Zoarski effectively "eviscerated" his own qualifications, stating that "[Dr. Zoarski's] statement that it's outside his expertise I think [eviscerates] any basis for his, for the admissibility of that testimony." In so finding, the trial court was referring to the following excerpt, wherein Dr. Zoarski was discussing that the March 9 films revealed a spinal cord injury that was not present on March 6, and how immobilization could have prevented that injury:

[Appellant's Counsel]: I'm not sure he covered it, he may have covered it, that had she been immobilized on the early morning of the 7th, whether the spinal fracture would have progressed.

[Appellee's Counsel]: I think you covered that, but let me ask a follow-up to get it clear for the record.

[Dr. Zoarski]: That is my opinion, that it would not have progressed or more likely than not would not have progressed. She would not have suffered the spinal cord injury that she suffered had it been appropriately stabilized and immobilized.

[Appellee's Counsel]: And do you have an opinion as to how long she should have been immobilized and in what method she should have been immobilized, or would you defer to the orthopedists and neurologists on that?

[Dr. Zoarski]: Yeah. How long really is immobilization until there's fixation. How she's mobilized [sic] and the specifics of how that is done is not within my expertise.

On appeal, appellant argues that Dr. Zoarski did not admit that he was not qualified. Rather, according to appellant, he

"merely testified at deposition that he could not give any standard of care opinions regarding how long or in what manner Ms. Reynolds should have been immobilized, because those decisions are made by physicians in other specialties." Thus, appellant argues, because she was offering Dr. Zoarski's testimony on the issue of causation in order to explain that immobilization would have prevented Mrs. Reynolds's paralysis, the quoted excerpt does not amount to an evisceration of his qualifications to offer that particular opinion. We agree.

Dr. Zoarski merely admitted that the specifics as to *how* Ms. Reynolds should have been immobilized are outside of his expertise. Yet the question as to *how* Ms. Reynolds should have been immobilized is distinctly different from the question as to *whether* immobilization would have prevented the progression of the spinal injury to the point of paralysis between March 6 and March 9. While admitting that the former question is outside his expertise, Dr. Zoarski made no such admission regarding the latter. Stated succinctly, his concession that he could not opine as to how the immobilization should be performed was not a basis for excluding his testimony that it should have been performed. As a result, Dr. Zoarski did not eviscerate his own qualifications to offer this opinion, and the trial court abused its discretion in excluding his testimony on this ground.

## Conclusion

We merely reiterate that, on the stated bases, the trial court abused its discretion in excluding appellant's experts on the issue of causation. We express no opinion on standard of care, or any other related issues involved in this case.

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR FREDERICK COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES IN EQUAL SHARES.**