REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 558

September Term, 2013

JAKEEM ROY

v.

ELLIOT DACKMAN, *et al.*

Zarnoch,
Kehoe,
Leahy,

JJ.

Opinion by Leahy, J.

Filed: October 6, 2014

Jakeem Roy ("Roy" or "Appellant") was exposed to lead before he reached age two, according to his blood tests taken on September 17, 1997. Roy filed a complaint through his mother, Latisha Hillery, in the Circuit Court for Baltimore City on June 29, 2011, against the owners of the two-story brick row house on 2525 Oswego Avenue where he lived for a short period as a baby, and where, he claims, he was exposed to lead paint. Roy asserts that as a result of the acts and omissions of the owners of the row house, Elliot and Sandra Dackman, Jacob Dackman & Sons, L.L.C., and Brina Corporation ("the Dackmans" or "Appellees"), he was exposed to quantities of chipping, peeling, and flaking lead-based paint powder and dust which was a direct and proximate cause of injuries he maintains he sustained from lead poisoning.

This appeal is from the circuit court's grant of summary judgment in the Dackmans' favor.

Roy presents three issues for our review, which we have rephrased as follows:

1.    Did the circuit court err when it excluded pediatrician's testimony that Roy suffered injuries from exposure to lead paint and that 2525 Oswego Avenue was a substantial contributing cause of Roy's injuries?

2.    Did the circuit court err in granting summary judgment in favor of Appellees based on the exclusion of pediatrician's testimony and Appellant's failure to present expert medical evidence?

3.    Did the circuit court err in finding that the circumstantial evidence presented was insufficient to defeat summary judgment?

We find on all three questions that the circuit court did not err and we affirm its grant of summary judgment. The court appropriately excluded the proffered expert testimony of Appellant's pediatrician because he was not qualified as an expert for the

1

same reasons we found him not qualified in *City Homes v. Hazelwood,* 210 Md. App. 615, *cert. denied*, 432 Md. 468 (2013), and because there was insufficient evidence to form the factual predicate to support his testimony. The circumstantial evidence presented (and upon which the pediatrician relied) was also insufficient to independently establish a *prima facie* case for causation consistent with *Hamilton, et al. v. Kirson, et ux.*, ___ Md. ___, ___, No. 78-100, Sept. Term 2013 (filed June 20, 2014), and the three lead paint causation links articulated in *Ross v. Housing Auth. of Baltimore City*, 430 Md. 648, 668 (2013).

**Roy's Complaint**[1]

The amended complaint ("complaint")[2] alleges that Roy "ingested and consumed paint chips and dust containing lead and lead pigments while living at the property," and that the Dackmans "fail[ed] to comply with laws, rules, regulations and ordinances of the State of Maryland and City of Baltimore that prohibit flaking, loose or peeling paint, . . . the use of paint with lead pigment, and the rental of dwellings that contain flaking, loose,

[1] The complaint below was served on Elliot Dackman, individually and as trustee of the assets of Jacob Dackman & Sons, L.L.C., and Sandra Dackman, individually and as trustee of the assets of Brina Corporation. The record contains documents showing that 2525 Oswego Avenue was owned by Brina Corporation from August 1, 1990 until July 11, 1995, when it was sold to Florine Payne. On November 25, 1996, Florine Payne assigned the property back to Brina Corporation, and in 2003, Payne assigned the property to 2807 Violat Avenue, LLC. However, Violat Avenue LLC was never named or joined as a party to this action. On July 26, 2012, Appellees filed a Suggestion of Death notifying the circuit court of the passing of Sandra Dackman on April 1, 2012.

[2] The complaint was amended on December 18, 2012, to add the estate of Sandra Dackman as an additional party defendant.

or peeling paint."[3]   As a consequence, the complaint states Roy "suffered lead poisoning . . . was subjected to painful testing and treatment . . . and has suffered permanent brain damage resulting in developmental and behavioral injuries."   The complaint further alleges that the Dackmans observed the condition of 2525 Oswego Avenue and therefore had reason to know of the inherently unreasonable danger to which they exposed their tenants, Roy and his family, to whom they owed a duty to use ordinary care to ensure the property was safe and free of any lead contamination. Counts I, II, and V declare that Roy's lead poisoning and injuries are the direct, foreseeable and proximate result of the Dackmans' negligence.  Counts II, IV, and VI claim the Dackmans engaged in unfair and deceptive trade practices in violation of Maryland law by leasing the property to Roy and his family, without notice or warning of its hazardous condition, and while concealing the true condition of the property.[4]

**Roy's Childhood Residences**

Roy was born in the City of Baltimore, Maryland, on April 26, 1996.  He resided at 2801 Virginia Avenue, Apartment C8, for approximately the first eight months to one year of his life.  The record is equivocal on the date Roy and his family moved to 2525

---

[3]   The complaint does not contain an allegation regarding the age of the row house, but in response to the Dackmans' Motion for Summary Judgment, Roy produced a copy of a data search sheet for 2525 Oswego Avenue from the Maryland State Department of Assessments showing that the primary structure was built in 1920.

[4]

Although the complaint contains three counts alleging unfair trade practices, in violation of the Maryland Consumer Protection act ("CPA"), *see* Maryland Code (1975, 2013 repl. Vol.) Commercial Law Article, § 13-303, the parties did not raise any issue regarding these counts on appeal. We do not discuss these claims further.

3

Oswego Avenue. Roy contends that he resided at 2525 Oswego Avenue from the "fall of 1996 through November 1998" in his brief submitted to the court; however, the complaint alleges in paragraph four that Roy resided at the property from "approximately 1997 to approximately 1998." Roy's mother, Latisha Hillery, testified during her deposition that Roy moved into the premises in the fall 1996; however, Roy's Answers to Interrogatories indicate that Roy lived at 2525 Oswego Avenue from January 1997 to 1998.

Business records submitted by the Dackmans indicate that the property was undergoing significant renovations from January 7, 1997 through April 3, 1997. These renovations included extensive cleaning, painting, repairing the roof and skylights, repairing ten windows, replacing doors and door frames, repairing walls and sheet rock throughout the house, and installing metal on the window sills. The Dackmans contend that the property would not have been occupied during that time. The record also contains several work orders for minor repairs on the property dated May 2, 1997, one including a note that a new tenant was moving in at the beginning of May 1997.

Roy and his family vacated the house in November of 1998, following damage caused by a house fire next door. Ms. Hillery testified that she moved with Roy and her other children, Jamal and Jaquincia, to 3710 Hayward Avenue in Baltimore City.

**Lead Paint Tests**

The Baltimore City Health Department ("Health Department") was one of the first municipal agencies in the world to officially recognize the problem of lead poisoning in

4

children related to flaking and peeling lead paint in 1931.[5]  Since that time, the Health Department has advocated for and maintained programs to address this public health concern, including: lead-based paint usage prohibitions, rental property inspections, and strict risk abatement procedures.  Inspections are conducted by licensed inspection contractors on behalf of the Maryland Department of the Environment ("MDE") pursuant to the Maryland Lead Risk Reduction in Housing Law.  Code of Maryland Regulations ("COMAR") 26.16.01.  The law requires that any rental dwelling unit constructed prior to

---

[5]    Richard Rabin, 79 Am J. Pub. Health, 1669 (Dec. 1989).  Following several fatal lead poisoning cases, in 1935 the Bureau of Laboratories for the department began providing free testing services to health care providers for determining blood lead levels. George W. Schucker, et al. *Prevention of Lead Paint Poisoning Among Baltimore Children*, 80 Pub. Health Rep. 969 (Nov. 1965).  Monitoring of the problem continued, and in 1949 the city assigned a public health nurse to investigate reports of childhood lead consumption further and began distributing pamphlets and educational materials to health care providers and affected families.  Efforts at legislative control followed throughout the 1950s. *Id.*

In June of 1951, the Baltimore City Commissioner of Health adopted Regulation 17 which read: "[n]o paint shall be used for interior painting of any dwelling or dwelling unit or any part thereof unless the paint is free from any lead pigment." *See* Baltimore City Health Dep't, *Baltimore Health News,* 113–116 (Aug.-Sept. 1951) (reprinting data and regulation).  A study by the Bureau of Industrial Hygiene then concluded that there was a 98 percent probability of finding lead paint in a Baltimore City home where extensive paint samplings were taken. Schucker, *supra*, at 970.

Following the creation of Urban Renewal Districts in the 1960s, Health Regulation 17 was codified in Ordinance Number 902 (1966), Art. 13, § 706, of the Baltimore City Code.  Nancy L. Long, *Maryland Lead Poisoning Litigation* 12 (1986).  Next, a 1969 ordinance required that: "[a]ll lead based paint shall be removed from interior surfaces of dwellings before repainting."  Baltimore City Ordinances & Resolutions, No. 794, at 380 (1969-1970).  Finally, in 1971, the Maryland General Assembly prohibited the use of lead-based paint state-wide "on any interior surface; on any exterior surface to which children commonly may be exposed; on any porch of any dwelling; or except for a lead-based industrial paint that is applied to a household appliance, on any article that is intended for household use."  1971 Md. Laws, ch. 495; Maryland Code (1982, 2013 Repl. Vol.) Environment Article § 6-301.

1950 be registered with MDE and inspected prior to new tenant occupancy. Maryland Code (1982, 2013 Repl. Vol.), Environment Article ("Envir."), § 6-811 *et seq.*

The Dackmans assert that they had the property inspected by the State and that the Baltimore City Health Department has no record of any violations of Baltimore City ordinances relating to lead paint at 2525 Oswego Avenue. The MDE Lead Paint Risk Reduction Inspection Certificate issued for 2525 Oswego Avenue on April 22, 1997, indicates that the property was in compliance with the Full Risk Reduction standards. A further inspection conducted by MDE on September 14, 1999, also found the property to be in full compliance. Although there are several lead paint inspection categories, the inspections completed at 2525 Oswego Avenue were Full Risk Reduction inspections.[6]

Pursuant to the pre-trial scheduling order in the case on appeal, Roy employed ARC Environmental Inc. ("ARC") to conduct testing at 2525 Oswego Avenue. ARC prepared a Lead-based Paint Survey Report in September of 2012. However, because the property was vacant and boarded at the time of testing, only the exterior of the premises was tested.[7] Those test results indicated the positive presence of lead-based paint on the

---

[6] A Full Risk Reduction inspection is generally conducted in a vacant unit prior to occupancy by a new tenant. Envir. § 6-815. The Full Risk Reduction standard is met by passing the test for lead-contaminated dust, provided that any chipping peeling, or flaking paint has been removed or repainted on the interior and exterior of the rental dwelling unit. *Id.* After verifying that paint condition meets the standard, the accredited inspector must collect dust samples from each room in the unit. *Id.* Each dust sample must be analyzed by a qualified laboratory, and the results must fall below specified levels. Envir. § 6-816.

[7] The circuit court record includes a second ARC Environmental test that was conducted on April 25, 2013, which included positive lead test results on the interior of 2525 Oswego. The test results are not referenced by either party. It was not presented to the circuit court as an exhibit attached to any responsive motion opposing summary

6

exterior first floor window sill, wall surface, handrail, porch posts, basement window sash, and basement door threshold of 2525 Oswego Avenue.

**Blood Lead Levels**

Although it is unknown what Roy's blood lead level ("BLL") was prior to living at 2525 Oswego Avenue, reports by the Maryland Department of Health and Mental Hygiene indicate that he had elevated levels from late 1997 through 1999. His blood levels tested as follows:

| Sample Date | Blood Lead Level |
| --- | --- |
| 09/17/97 | 15 ug/dl |
| 11/19/97 | 10 ug/dl |
| 05/15/98 | 10 ug/dl |
| 12/07/99 | 9 ug/dl |

judgment nor was it presented at the May 6, 2013, hearing. Nonetheless, even assuming the test results were able to survive challenge and be considered as evidence, the motion for summary judgment would still have been providently granted because of the lack of expert testimony regarding medical causation. As discussed *infra,* the Courts of Maryland have never held that the full spectrum of causation in a lead-based paint claim may be proved through circumstantial evidence. Although in *Dow v. L & R Properties, Inc.*, 144 Md. App. 67, 75 (2002), *Ross v. Housing Authority of Baltimore City*, 430 Md. 648, 668 (2013), and *Hamilton, et al. v. Kirson, et ux.*, ___ Md. ___, ___, No. 78-100, Sept. Term 2013, slip op. at 29 (filed June 20, 2014), the appellate courts of Maryland have found that circumstantial evidence may be sufficient to establish the link between the defendant's property and the plaintiff's exposure to lead, we can find no support in Maryland for the proposition that the link between blood lead level and the specific injuries of a plaintiff may be proved solely through circumstantial evidence.

7

Roy's first documented elevated BLL occurred on September 17, 1997.[8]  This initial elevated reading prompted a follow-up screening on November 19, 1997.  The second screening indicated that Roy's BLL had fallen from 15 ug/dl to 10 ug/dl.  Additional screening results show that Roy's BLL remained at 10 ug/dl for the duration of his tenancy at 2525 Oswego Avenue.

**Proposed Expert Testimony**

The proffered expert who was the subject of the dispositive motion was Dr. Eric Sundel ("Dr. Sundel"), a board-certified pediatrician with more than 20 years of experience.  Dr. Sundel was retained by counsel for Roy to provide an opinion on whether Roy had been exposed to toxic lead levels at 2525 Oswego Avenue and whether that exposure resulted in injury.

In 2012, Dr. Sundel reviewed Roy's medical and school records. He also reviewed the SDAT sheet and exterior ARC report for 2525 Oswego Avenue.  Based on his review of those documents, he prepared a report dated October 17, 2012, in which he noted that the house at 2525 Oswego Avenue was constructed in 1920 and that "Jakeem's mother

---

[8]     Roy's BLL on September 17, 1997 was 15.  BLL is measured in micro-grams per deciliter. According to *Preventing Lead Poisoning in Young Children*, a 2005 publication of the Centers for Disease Control ("CDC") submitted by Roy, readings equal to or greater than 15 ug/dl require follow-up action.  In 2012, the CDC's Advisory Committee on Childhood Lead Poisoning Prevention report—relied upon by Dr. Sundel— recommended that experts use a reference level of 5 ug/dl to identify children with elevated blood lead levels requiring case management. Report of the Advisory Committee on Childhood Lead Poisoning Prevention of the Centers for Disease Control and Prevention, *Low Level Lead Exposure Harms Children: A Renewed Call for Primary Prevention*  (Jan. 4, 2012),  *available at* http://www.cdc.gov/nceh/lead/acclpp/final_document_010412.pdf.

recalls chipping, flaking and peeling paint on the windows and window frames when she first moved in." He noted that Roy's school records revealed that Roy was "very oppositional with staff" and "very hyper." He noted that Roy had neuropsychological testing performed in January, 2012, and that "his full-scale IQ was 78, which fell in the borderline impaired range of intellectual function." Dr. Sundel stated in this report:

> From multiple studies, it has been established that the major source of lead poisoning for children in the United States is the hand-to-mouth ingestion of dust and chips from deteriorating lead paint on interior surfaces in older homes. Hand-to-mouth activity is most common in the first six years of life. According to the EPA, 97% of homes in the United States build before 1940 are likely to contain lead. In 1991, the CDC advised that blood lead levels of 10 mcg/dl or greater should prompt public health action to minimize the risk of neurological and other damage. In 2012, the CDC advised that this blood lead level be lowered to 5 mcg/dl. To date, no safe lower limit of detectable blood lead has been determined.

With respect to Roy's specific history, Dr. Sundel concluded:

> In summary, Jakeem Roy had three elevated blood lead levels while residing at 2525 Oswego Avenue from about 8 months of age to just over two years of life. The house at 2525 Oswego Avenue was built in 1920, when virtually all homes were painted with lead-based paint. Furthermore, ARC testing performed in 2012 of this house's exterior confirmed the presence of lead-based paint.

Dr. Sundel opined that Roy had been exposed to lead while residing at 2525 Oswego Avenue resulting in "loss of IQ points, as well as other deficits including, impaired attention, problems with memory, and problems with coordination," and that "these harmful effects are expected to be permanent."

Dr. Sundel's deposition testimony, taken November 13, 2012, established that he had extensive practice in pediatric medicine. But his testimony also revealed that

9

although he was familiar with some relevant studies and literature on pediatric lead poisoning, he had never diagnosed or studied an individual with injuries or issues related to lead. Dr. Sundel testified as to his significant experience as a pediatric hospitalist "clinically managing the inpatients, the hospitalized pediatric patients, as well as seeing children in the emergency department." During his career, however, Dr. Sundel's single experience with lead poisoning was his participation in the treatment of a child for lead poisoning during his first or second year of residency at Columbia Presbyterian Babies Hospital in either 1985 or 1986. Dr. Sundel had never authored or contributed to any publications regarding lead exposure.

Regarding the medical effects of exposure to lead-based paint, Dr. Sundel had no background in neurology, neuropsychology, or medical toxicology upon which to base his conclusion that exposure resulted in a loss of IQ points for Roy. Dr. Sundel admitted he did not administer IQ tests and did not know how such tests are scored. He had never conducted or participated in any studies assessing the cognitive effects or consequences of lead poisoning. Finally, in the matter before us, Dr. Sundel did not conduct a medical history of Roy and did not examine Roy. Dr. Sundel explained in his April 11, 2013, affidavit:

> Lead exposure has no signature of physical characteristics that would assist in the diagnosis of lead poisoning. It is, therefore, not necessary for me, or any other pediatrician, to actually conduct a physical examination of Mr. Roy who is currently 16 years of age to determine if he was suffering any injuries due to lead.

10

The second expert offered by Roy was Industrial Hygienist Robert K. Simon, Ph.D. ("Dr. Simon").[9]  In his June 2, 2012, report, Dr. Simon opined that "2525 Oswego Avenue, Baltimore, MD 21218 was the location at which Jakeem Roy was initially, and continu[ally] exposed to lead-based paint hazards."  Dr. Simon admitted during his deposition, however, that his opinion was based entirely on records provided to him by Appellant's counsel:

> Q.  And doctor, you've never inspected or tested the property in this case, 2525 Oswego Avenue; is that correct?
>
> A.  Correct.
>
> Q.  You have never visited the property?
>
> A.  No.
>
> Q.  Have you had any conversations with any family members of the plaintiff in this case?
>
> A.  No.
>
> Q.  Have you had any conversations with any of the experts designated in this case by either the plaintiff or the defendants?
>
> A.  No.
>                                *** 
>
> Q.  Doctor, can we agree that your opinions in this case are based entirely on records provided to you by Nicholl's law office?
>
>                                *** 
>
> A.  Correct.

---

[9]

Dr. Simon is the same industrial hygiene expert and environmental lead risk assessor presented by the appellant in *Hamilton,* slip op. at 21.

11

Dr. Simon also testified that he neither tested nor considered any other properties as a possible source of Roy's lead exposure.

**Motion to Exclude and for Summary Judgment**

On January 2, 2013, the Dackmans filed a "Motion to Exclude Plaintiff's Experts and Motion for Summary Judgment" (hereinafter "Motion for Summary Judgment").[10] The Dackmans sought to exclude both of Roy's expert witnesses, Dr. Sundel and Dr. Simon, on the basis that they lack the qualifications and sufficient factual bases required by Maryland Rule 5-702. After a full hearing before the circuit court on February 20, 2013, the motions were denied. Shortly thereafter, this Court published its opinion in *Hazelwood*, a case involving facts very similar to those *sub judice,* in which we reversed and remanded, finding that the circuit court abused its discretion in permitting the same pediatrician, Dr. Sundel, to testify as an expert on childhood lead exposure and poisoning because he was not qualified and lacked a sufficient factual basis for his opinions. *Hazelwood, supra,* 210 Md. App. at 684-91. The Dackmans then renewed their Motion for Summary Judgment.

On May 6, 2013, the Circuit Court for Baltimore City heard argument on the motions. In its May 7, 2013, order, the circuit court granted the renewed motion, finding that Dr. Eric Sundel "is not qualified to provide expert opinion as the source of lead exposure that resulted in [Roy's] elevated lead levels," nor is he qualified to provide an

---

[10] The Dackmans filed a single motion entitled "MOTION TO EXCLUDE PLAINTIFF'S EXPERTS AND MOTION FOR SUMMARY JUDGMENT," requesting the singular relief that the court "enter summary judgment in the Plaintiff's claim as a matter of law."

12

expert opinion "as to causation *i.e.* that [Roy] incurred injuries as a result of lead exposure." The court found that without the testimony of a medical expert, Roy could not demonstrate "the link between [his elevated] blood lead levels and the injuries allegedly suffered by the plaintiff."

Additional facts will be presented as they pertain to the issues discussed.

## DISCUSSION

### I.
### Exclusion of Dr. Sundel's Testimony

Roy contends that the circuit court erred and abused its discretion in excluding Dr. Sundel's testimony. Roy argues that Dr. Sundel, as a longtime pediatrician who is familiar with some of the current lead paint poisoning literature and studies, is qualified as a medical expert by his "knowledge, skill, experience, training or education." Md. Rule 5-702. Roy further asserts that Dr. Sundel's review of Roy's medical records, relevant property records, and the exterior ARC report provides a sufficient factual basis for his testimony.

The Dackmans respond that Dr. Sundel (1) has never diagnosed or treated a patient with lead poisoning; (2) is not a certified lead risk assessor; (3) has never published any articles or participated in any studies related to lead; (4) has not examined Roy; (5) has no experience in testing for lead; (6) did not know whether the water at any of Roy's residences had been tested for lead; and (7) did not know or inquire whether 2525 Oswego Avenue had been renovated or rehabilitated prior to Roy's tenancy.

13

## A.
## Standard of Review

Generally, evidentiary rulings admitting or excluding expert testimony are reviewed under an abuse of discretion standard, and the trial court's determination is only reversible where it is founded on an error of law, or where the trial court has clearly abused its discretion. *Hazelwood*, 210 Md. App. at 675-76 (2013); *Taylor v. Fishkind*, 207 Md. App. 121, 137 (2012), *cert. denied*, 431 Md. 221 (2013). Here, as in *Hamilton v. Kirson*, the evidence presented by Roy on causation was the same evidence the experts relied upon to form their opinions.[11] *Hamilton v. Kirson,* No. 1530, Sept. Term, 2011, slip op. at 14-15 (Md. Ct. Spec. App. Apr. 30), *cert. granted*, 433 Md. 513 (2013) (hereinafter "*Kirson*"). The Court of Appeals clarified that when a circuit court "grants a summary judgment motion on the grounds that the plaintiff's expert lacks a sufficient factual basis of admissible facts and the admissible evidence (if any) is insufficient independently to prove causation, the circuit court is making a decision on the admissibility of the expert's testimony as part of its summary judgment decision," which "is reviewed on appeal without deference." *Hamilton,* slip op. at 17-18, n.11 (citing *Giant Food, Inc. v. Booker*, 152 Md. App. 166, 176-78 (2003)). Further, "ordinarily an appellate court will review a grant of summary judgment only upon the grounds relied

[11]    As described in f.n. 9, *supra,* the motion for summary judgment and exclusion of experts was filed as one motion. In reviewing this motion, the determination of the admissibility of the expert is part-and-parcel with the overall summary judgment decision. *Hamilton*, slip op. at 17-18, n.11.

upon by the trial court." *Id.,* slip op. at 20 (citing *Bishop v. State Farm*, 360 Md. 225, 234 (2000)). Thus, we review the grant of the motion for summary judgment in this case to determine whether the trial court's decision was legally correct and give no deference to the underlying determinations. *Id.*, slip op. at 19 (citing *Tyler v. City of Coll. Park*, 415 Md. 475, 498 (2010); *Beatty v. Trailmaster Products, Inc.*, 330 Md. 726, 737 (1993)).

**B.**
**Law and Analysis**

Expert testimony may be admitted if the court determines that the testimony will assist the trier of fact in understanding the evidence or determining an issue of fact. Maryland Rule 5-702 outlines the factors a court must evaluate when considering the admission of expert testimony. The rule provides:

> Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

Md. Rule 5-702. The instant case presents questions on both the first and third of these delineated factors.

**Factor 1 – Qualification**

The first requirement is that an expert be sufficiently qualified, having "special knowledge of the subject on which he is to testify that he can give the jury assistance in solving a problem for which their equipment of average knowledge is inadequate." *Casualty Ins. Co. v. Messenger,* 181 Md. 295, 298 (1943); Md. Rule 5-702(1). In

15

summarizing the case law, the Court of Appeals has instructed that "a witness may be competent to express an expert opinion if he is reasonably familiar with the subject under investigation regardless of whether this special knowledge is based upon professional training, observation, actual experience, or any combination of these factors." *Radman v. Harold*, 279 Md. 167, 167-68 (1977).

An expert's knowledge on a subject "may be derived from 'observation or experience, standard books, maps of recognized authority, or any other reliable sources,' including 'the experiments and reasoning of others, communicated by personal association or through books or other sources.'" *Wantz v. Afzal*, 197 Md. App. 675, 683 (2011) (quoting *Radman*, 279 Md. at 169). A witness need not be personally involved in the activity about which he is to testify. *Id.* (quoting *Radman*, 279 Md. at 171). Nor is it required that an expert be a specialist to be competent to testify regarding medical matters under Rule 5-702. *Id.* at 685 (citing *Ungar v. Handelsman*, 325 Md. 135, 146 (1992)).

In *Hazelwood,* as in the matter before us now, we examined whether the same witness, Dr. Sundel, was qualified to offer an expert opinion in a lead paint case. We could "discern no basis on which to conclude that Dr. Sundel had specialized knowledge concerning childhood lead poisoning," and "[n]othing about Dr. Sundel's work generally as a pediatrician [led] to the conclusion that he was qualified to render the expert opinions he offered in [that] case." *Hazelwood*, 210 Md. App. at 686. In accordance with those findings, we held that Dr. Sundel was not qualified to offer expert opinion in a lead paint case and that it was an abuse of discretion for the circuit court to allow such testimony.

16

At the May 6, 2013, hearing in the instant case on the renewed motion for summary judgment, the circuit court acknowledged that Roy "ha[s] a problem with the [*Hazelwood*] case." The court also noted that the findings in *Hazelwood*—that Dr. Sundel had not received any specialized training, had no experience in treating children with lead poisoning and had no experience identifying the source of childhood lead exposure—were the same arguments presented by the Dackmans.

The court observed, "[i]t would seem to me it would be an abuse of my discretion if in fact this were on all fours [with *Hazelwood*] and I said nonetheless, I'm going to allow Dr. Sundel to testify." The court then appropriately inquired as to what additional training, certification, or other supplementation to Dr. Sundel's background could be offered since *Hazelwood* that would qualify him as an expert in the instant case.

Roy's counsel indicated that Dr. Sundel had recently attended seminars on the process of testing a house for lead and cited Dr. Sundel's affidavit as establishing his additional bases for qualification. In his affidavit, Dr. Sundel asserts that since the *Hazelwood* case, he has "reviewed approximately 20 other matters that included environmental testing, … attended a seminar conducted by LeadTec regarding the use of XRF testing instruments and interpretation of test results," and "reviewed deposition testimony of former sanitarians of the Baltimore City Health Department and defense expert, Patrick Connor." Nothing in the record, however, indicates that Dr. Sundel received any further specific medical training or any certifications regarding lead or lead paint related injuries and illnesses, or treated any additional patients with lead poisoning.

In its May 7, 2013, order granting summary judgment, the court pronounced: "this court has not found any material differences between evidence offered in support of Dr. Sundel's expertise in *Hazelwood* and evidence offered in the present case."

17

**Factor 3 – Sufficient Factual Basis**

Md. Rule 5-702(3) also requires a sufficient factual basis to support the offered expert testimony. For an opinion to assist the trier of fact, the trier of fact must be able to evaluate the reasoning underlying that opinion. *Ross v. Housing Auth. of Baltimore City*, 430 Md. 648, 663 (2013). The opinion of even the most highly qualified expert has no probative force unless a sufficient factual basis to support a rational conclusion is shown. *Hazelwood*, 210 Md. App. at 678-79.

Again, the *Hazelwood* opinion, through its detailed exposition of the facts and the law, provides a platform for analyzing the basis for Dr. Sundel's opinions. In *Hazelwood*, as in this case, Dr. Sundel was not the treating physician, and the factual basis for his opinions "boil[ed] down to his review of the records provided to him by appellee's counsel," including the ARC Environmental report. *Id.* at 688. In both cases, Dr. Sundel failed to investigate other properties where the plaintiff resided or consider other potential sources of lead exposure. *Id.*

Although there is no dispute that an expert may base an opinion on data and facts not directly ascertained by him but contained in the reports and studies of others, those bases must permit reasonably accurate conclusions, not mere conjecture. *Id.* at 692 (citing *Milton Co. v. Council of Unit Owners of Bentley Place Condo.*, 121 Md. App. 100, 120 (1998)). In this case, Dr. Sundel opines that the source of Roy's lead exposure was 2525 Oswego Avenue based on: 1) deposition testimony from Latisha Hillery regarding the presence of peeling paint; 2) the ARC report results for the *exterior* of the premises;

and 3) the age of the home. Dr. Sundel also opines that exposure to lead-based paint at the house on 2525 Oswego Avenue resulted in a loss of IQ points for Roy, despite his admissions that he has no background in neuropsychology; does not administer IQ tests; does not know how such tests are scored; did not conduct a medical history of Roy; and did not examine Roy. The bases advanced for Dr. Sundel's opinions are consonant with those presented in *Hazelwood*, in which we stated that "it is evident that Dr. Sundel's testimony amounted to no more than speculation." *Hazelwood*, 210 Md. App. at 689.

As the circuit court observed, the instant case is "on all fours" with *Hazelwood* regarding Dr. Sundel's qualifications and the factual basis for his testimony. We find the circuit court was legally correct in excluding the expert testimony of Dr. Sundel.

## II.
## Causation

Roy, relying on *Dow v. L & R Properties, Inc.*, 144 Md. App. 67, 75 (2002), contends that even in the absence of expert testimony, causation in a lead-based paint case may be proved entirely through circumstantial evidence. Roy's contention is incorrect. In *Dow*, the issue raised in Appellee's Motion for Summary Judgment was specifically that "[t]he [Appellants] ha[d] identified no expert to testify that lead paint existed on the premises....[and] [n]o expert was identified to testify regarding any lead inspection or testing of the premises...." *Id.* at 70. In *Dow,* we held that the appellant presented sufficient circumstantial evidence in response to the appellee's motion for summary judgment to generate a genuine dispute as to the material fact of whether the

19

paint in the rental property owned by defendant contained lead. *Id.* at 74. We were "satisfied that appellants could properly establish that the paint in question was lead-based" and was the only possible source of the appellant's lead poisoning. *Id.* at 74-75. Thus, our decision in *Dow* addressed establishing the presence of lead at the property and did not address medical causation.

The Court of Appeals in *Hamilton* reasserted its analysis in *Ross*—that the theory of causation in lead paint cases may be conceived as a series of three separate links:

> (1) The link between the defendant's property and the plaintiff's exposure to lead; (2) the link between specific exposure to lead and the elevated blood lead levels, and (3) the link between those blood lead levels and the injuries allegedly suffered by the plaintiff.

*Hamilton,* slip op. at 26 (emphasis omitted) (quoting *Ross*, 430 Md. at 668).[12] In the matter *sub judice*, the May 7, 2013, order of the circuit court granting summary judgment states:

> FOUND that in order to prove his case, [Roy] must show the link between [his elevated] blood lead levels and the injuries allegedly suffered[.]
>
> ***
>
> FOUND that whether [Roy] received injury due to [his] exposure to lead-based paint requires the testimony of an expert, and with the exclusion of Dr. Sundel's testimony, [Roy] has no such evidence.

---

[12]

   In applying the *Ross* theory of causation, we are mindful that the Court of Appeals in both *Hamilton* and *Ross* cautioned that those decisions did not rule out the possibility that a plaintiff might demonstrate that lead exposure was a substantial factor in a resulting injury to an individual in other ways, *Hamilton*, slip op. at 26, n.15; *Ross*, 430 Md. at 668 n.20, but Roy did not attempt to make such a showing to the circuit court.

20

(Citations omitted) (Internal quotation marks omitted). Thus, the circuit court determined that Roy's claim failed on the third of the causation links. As discussed *infra*, *Dow*, *Ross*, and *Hamilton* each address when circumstantial evidence may be sufficient to establish the link between the property and the plaintiff's exposure to lead. Nonetheless, as a general matter, it remains true that expert testimony is required for link three—medical causation. *Johnson v. Rowhouses, Inc.*, 120 Md. App. 579, 594 (1998) ("The issue of whether [Appellant] received injury due to [] exposure to lead-based paint at the [] premises is one which requires the testimony of an expert." (citing *Bartholomee v. Casey*, 103 Md. App. 34, 59 (1994))).

Roy's complaint alleges that 2525 Oswego Avenue "contained lead-based paint in such deteriorated condition that it was peeling, chipping, and flaking from the wall, baseboards, windowsills and other areas of the premises."[13] The presence of flaking, loose, or peeling paint is a violation of Housing Code, Baltimore City Code (2000 Repl. Vol.), Art. 13, § 703. *See Hamilton*, slip op. at 22 ("[T]o establish a *prima facie* negligence case for lead-paint poisoning based on violation of the [Baltimore City] Housing Code, a plaintiff must show that there was flaking, loose, or peeling paint.") (citing *Brooks v. Lewin Realty III, Inc.*, 378 Md. 70, 80 (2003)). In *Brooks*, the Court

---

[13] Just as the Court of Appeals did in *Hamilton*, *supra,* slip op. at n.3, we also presume the Roy's complaint implicates violations of the Housing Code, Baltimore City Code (2000 Repl. Vol.), Art. 13, § 702, 703 & 706. Specifically, section 703 provides, in relevant part, that "good repair and safe condition shall include . . . [a]ll walls, ceilings, woodwork, doors and windows shall be kept clean and free of any flaking, loose, or peeling paint."

stated that these "provisions of the Housing Code were clearly enacted to prevent lead poisoning in children." 378 Md. at 88. Because, as a child at the time of exposure, Roy is in the class of people intended to be protected by statute and his injury is of the kind intended to be prevented by the statute, the presence of a violation of the Baltimore City Housing Code permits an inference of *prima facie* negligence on the part of the landlord. *Id.* at 80. "Such an inference, however, does not eliminate the requirement that the plaintiff prove that the landlord's negligence *caused proximately* the injury." *Hamilton*, slip op. at 23 (emphasis in original).

In *Hamilton*, the Court of Appeals, in the interest of resolving inconsistencies, surveyed the case law in Maryland to clarify "under what circumstances, if any, [] circumstantial evidence alone of the possible presence of lead-based paint inside a residential property [will] be sufficient to survive a defense motion for summary judgment challenging the sufficiency of proof of the causation element of a negligence claim against the landlord." *Id.*, slip op. at 16. The Court noted that to make out a *prima facie* case in a statutory lead paint poisoning negligence action a plaintiff must show: "(a) the violation of a statute or ordinance designed to protect a specific class of persons which includes the plaintiff, and (b) that the violation proximately caused the injury complained of." *Id.*, slip op. at 21 (quoting *Brooks*, 378 Md. at 79). Assuming there was a violation of the statute, the Court turned to the inquiry of "'causation in fact' one aspect of proximate cause, 'concerned with the more fundamental (and some have thought

metaphysical) inquiry of whether defendant's conduct actually produced an injury.'" *Id.*, slip op. at 24 (quoting *Peterson v. Underwood,* 258 Md. 9, 16-17 (1970)).

The *Hamilton* Court advised: "[i]n the present case[], we are concerned with the first link [from *Ross*]." Accordingly, the Court was concerned only with: "connect[ing] the dots between a defendant's property and a plaintiff's exposure to lead." *Id.*, slip op. at 27. Absent evidence to satisfy all the links of causation, a defendant is entitled to judgment as a matter of law. *See Taylor*, *supra,* 207 Md. App. at 148 (concluding that summary judgment was appropriate where the appellant failed to show that the defendant's conduct was a "substantial factor" in bringing about the alleged injury); *Johnson*, 120 Md. App. at 593 (affirming the circuit court's grant of summary judgment in favor of the defendant because the plaintiff's expert did not express an opinion as to whether exposure to lead on the defendant's property was a substantial cause of plaintiff's injuries).

Although expert testimony is generally used to establish each of the links of causation in a lead-based paint case, certainly, there is no requirement that causation be proved by direct proof or with absolute certainty. *Otis Elevator Co. v. LePore*, 229 Md. 52, 57 (1962). Circumstantial evidence may support an inference of causation as long as it "amounts to a reasonable likelihood, rather than a mere possibility." *Dow*, 144 Md. App. at 75 (quoting *Peterson,* 258 Md. at 17). Thus, in *Ross*, the court held that the link "between a defendant's property and a plaintiff's childhood exposure to lead paint and dust, may be established through circumstantial evidence." 430 Md. at 669.

The Court of Appeals' decision in *Ross* made clear that expert testimony on the first link of causation is not necessary for a plaintiff to survive summary judgment. In *Hamilton v. Dackman*, 213 Md. App. 589, 608 (2013) ("*Raymond Hamilton*") focusing on the first *Ross* link, we stated:

> *Ross* held that although an expert *can* helpfully connect the causal dots between lead in a building and a plaintiff's injuries, the dots can be connected without any expert as well. At the same time, an expert cannot transform thin evidence or assumptions into viable causal connections simply by labeling them an expert opinion. As such, *Ross* recalibrated the causation analysis to (re-)focus it on the quality of the evidence the parties marshal rather than the existence *vel non* or qualifications of experts.

213 Md. App. at 608-09 (emphasis in original) (internal citations omitted). Notwithstanding, where a plaintiff relies on the inferences generated by circumstantial evidence, "we require [those] inferences to be sound logically, and we refuse to allow a jury of laymen to engage in 'guess work, speculation and conjecture.'" *Hamilton*, slip op. at 26 (quoting *Wilhelm v. State Traffic Safety Comm.*, 230 Md. 91, 101 (1962)).

Returning to the matter before us, Roy's arguments conflate the first link in causation with the entirety of the lead paint causation spectrum. Evidence—circumstantial, expert, or otherwise—must be presented, allowing a reasonable fact-finder to make reasonable inferences regarding all three links of causation. *Ross*, 430 Md. at 670.

**Link 1 – Source Property**

In lead paint cases, such as the one before us, involving more than one potential source of exposure, the framework for analysis finds its genesis in *Bartholomee v. Casey*.

In *Bartholomee*, *supra*, we stated "[w]here the conduct of a defendant was a substantial factor in bringing about the suffering of an injury, such conduct will be deemed to have caused the injury." 103 Md. App. at 56. (Citation omitted). Often the conduct of more than one defendant may be a substantial factor in causing the outcome. Where it is clear that multiple properties were potential sources of lead contamination, the inferences necessary to connect the dots from defendant's property to plaintiff's harm are likewise multiplied. It remains, however, well established that there must be some evidence as to where culpability lies that "[a]mounts to a reasonable likelihood or probability rather than a possibility." *Dow*, 144 Md. App. at 75 (quoting *Peterson,* 258 Md. at 17).

In *Dow,* absent expert testimony, the evidence before the trial court revealed that the property concerned was built prior to 1950 when lead paint was commonly used, that the plaintiff had been observed eating paint chips on the property, that the plaintiff had elevated BLLs, and that there were no other potential sources of lead exposure. *Id.* at 70-75. Viewing this in the light most favorable to the plaintiff, we determined that a fact-finder could make a reasonable inference regarding the first link of causation; therefore, summary judgment on that basis was improper. By contrast, in both *Taylor v. Fishkind*, *supra*, and *Raymond Hamilton*, *supra,* absent expert testimony, the evidence before the trial court revealed that the property in question had been built prior to 1950 when lead paint was commonly used, the plaintiffs had been observed with paint chips on their hands, and they had elevated BLL. There was, however, evidence that there may have been multiple sources of lead exposure and direct evidence did not exist regarding any of

25

the sources. In both cases, we determined that the plaintiffs had failed to establish a *prima facie* link between the subject property and plaintiffs' lead exposure. In *Raymond Hamilton,* we stated:

> [A] plaintiff bears the burden to establish the presence of lead in the child's environment, and cannot just assume it merely from the age or location of the house. We also recognize the real-life evidentiary challenges that proving lead paint injuries poses (based on practical realities like the relocation of residents and subsequent gut-rehabilitation or remediation of properties that improves present living conditions but spoils potential evidence pertinent to a plaintiff's lawsuit), but we have declined the invitation to assume causation away.

> \* \* \*

> [A] plaintiff must connect the dots between a particular lead-laden environment and a particular child. By allowing a plaintiff to meet this burden with circumstantial evidence, we recognize that the causal path may not always reveal itself fully through documents, real-time tests or inspections of the property, or other forms of direct evidence. But just as a plaintiff cannot assume causation, he cannot surmount this hurdle through speculation—the overarching principle, which is neither new nor indigenous to lead paint cases, is that "[c]ircumstantial evidence may support a negligence determination if it 'amount[s] to a *reasonable likelihood or probability* rather than a possibility."

213 Md. App. at 613-14 (internal citations omitted). Unlike *Dow*, the plaintiffs in *Taylor* and *Raymond Hamilton* could not rely on an inference that any lead in their blood came from a specific property simply by virtue of that property being the only possible source. Nor can Roy rely on such an inference.

Roy presented evidence that he resided at 2525 Oswego Avenue during a critical early-childhood period during which he experienced elevated BLL. He presented evidence that the property was constructed prior to 1950 when the use of lead paint was common, and he presented testimony indicating that there was flaking or chipping paint

in some areas. However, at the summary judgment stage, Roy presented no direct evidence that he was exposed to any lead paint from the interior of the property. Furthermore, prior to his first BLL test, Roy also lived for at least one year at a different address in Baltimore. Though Roy need not rule out every other potential source, in the absence of such an exclusion, he must present evidence sufficient to give rise to the reasonable inference that 2525 Oswego Avenue was *probably* a source of lead exposure, not merely *possibly.*

**Link 2 – Elevated Blood Level**

The second causation link in lead paint cases requires evidence "that exposure must have contributed to the [plaintiff's] elevated blood lead levels." *Ross*, 430 Md. at 668. Traditionally, this has been the province of both expert testimony and circumstantial evidence and is the least controversial or contested of the three *Ross* causation links. For that reason, we will forego a lengthy analysis of the principle and merely apply the facts of the present matter.

Roy presented evidence indicating his increased blood lead levels during early childhood and testimony citing peeling or chipping paint. Further, the deposition testimony given by industrial hygienist and lead risk assessment expert, Dr. Simon, indicates that if lead-based paint were present during the relevant period of childhood, Roy could likely have ingested enough of the material to increase his blood lead levels detrimentally. If the inference of a *probable* source of the lead exposure were proper, Roy would likely meet his burden regarding this second link.

**Link 3 – Medical Harm**

Despite Roy's contention that "Dr. Sundel, was at a minimum, qualified to opine as to Roy's medical injuries," the circuit court's ruling on May 7, 2013, found that Dr. Sundel was not qualified to testify to either the source of the lead—link one—or the medical injuries—link three.  In *Hazelwood*, this court stated:

> [I]t is patently clear that Dr. Sundel was simply not qualified to testify as to appellee's IQ or the loss of IQ points resulting from lead exposure or any alleged "brain impairment."  The record fails to substantiate that Dr. Sundel possessed specialized knowledge about lead poisoning from either his own observation, or any experience or training—which was extremely bare and lacking as to lead poisoning.

210 Md. App. at 686.  Despite Dr. Sundel's affidavit noting that he has reviewed additional relevant materials and attended a LeadTec seminar on XRF testing, this case is "on all fours" with *Hazelwood*.  Just as in *Hazelwood*, Dr. Sundel still:

> has not received any specialized training nor does he have any experience in treating children with lead poisoning or in identifying the source of a child's lead exposure[;]
>
> ***
>
> has not evaluated and diagnosed children with lead poisoning, or monitored the progress of children diagnosed with lead poisoning[;]
>
> ***
>
> has [n]ever treated a child for symptoms related to lead ingestion where he "determined that the child was injured or had some issues related in any way to lead"[;]
>
> ***
>
> has not published any articles related to lead, been involved in any studies related to lead, or delivered lectures on the topic of lead or lead ingestion[;]
>
> ***

28

is not a board-certified psychologist or neuropsychologist, and [] does not administer IQ or achievement tests[;]

\*\*\*

does not know how to score an IQ test, and did not know the standard of error for the Weschler IQ test[;]

\*\*\*

[and] has not conducted a medical or nutritional history of appellee nor ha[s] he examined appellee.

*Id*. at 684-86.

Certainly we have recognized that an expert's knowledge on a subject may be derived from standard books and other reliable sources. *Wantz*, 197 Md. App. at 683. However, the expert witness must still "possess special and sufficient knowledge regardless of whether such knowledge was obtained from study, observation or experience." *Radman*, 279 Md. at 171 (quoting *Rotwein v. Bogart*, 227 Md. 434, 437 (1962). The classic example of this concept was articulated by the Court of Appeals: "[a] law professor may be an expert on trial procedure even though he has never tried a case[, and] [t]here are many expert astronauts who have yet to make a space flight." *Rotwein*, 227 Md. at 437. However, the Court in *Radman* also recognized "the complexity of knowledge required in the various medical specialties," and found that "more than a casual familiarity with the specialty [] is required." 279 Md. at 172. Dr. Sundel is neither a professor lecturing on lead poisoning nor a lead poisoning researcher preparing for his first patient trials. Further, we can find no support for the idea that a witness working in a broadly related field may become an expert in a complex and

29

specialized medical matter solely by reviewing related literature over the course of several months. Accordingly, we can find no basis to conclude that Dr. Sundel has specialized knowledge concerning childhood lead poisoning or its effects on development and cognitive function.

Roy argues that under *Ross,* even without the testimony of Dr. Sundel, causation may be proved through the testimony of their second expert, Industrial Hygienist Robert Simon, Ph.D., and other circumstantial evidence. However, Dr. Simon was proffered as an expert in lead risk assessment and toxicology, and he acknowledged, in his November 9, 2012, deposition testimony that he "would not [perform a medical differential diagnosis] or give specific causation testimony." He continued, stating: "I am not a medical doctor. You have to be a medical doctor to be, quote, a medical toxicologist, per se." Further, Dr. Simon's report submitted by Roy opines that 2525 Oswego Avenue was a source of Roy's lead exposure but makes no conclusions or claims about the medical significance of such exposure.

Notably, in *Ross*, the medical expert, Dr. Blackwell-White, was excluded as an expert to the source of lead exposure, but not as to the medical link between the level of exposure as evidenced by BLL testing and the injury. 430 Md. at 670. The causation link established through circumstantial or other expert testimony in that case was only regarding the presence of lead at the subject property. Expert testimony regarding the medical effect of such exposure was still present to be considered. In that case, the

30

presence of evidence that would allow a fact-finder to make reasonable inferences regarding all three links of causation, therefore, precluded summary judgment. *Id.* at 671.

Here, in the absence of expert medical testimony, the testimony of Industrial Hygienist Dr. Simon fails to establish the link between Roy's lead exposure and his alleged injury. Under the "substantial factor" analysis from *Ross*, even if Dr. Simon's testimony were sufficient to show that 2525 Oswego Avenue was a source of Roy's exposure to lead, it would not support the inference that the associated increase in blood lead level was substantial enough to contribute to Roy's injuries. *See Bartholomee* 103 Md. App. at 59-60 (explaining that expert testimony would be required to demonstrate that the child's exposure to lead during a particular window of time was "*by itself*" a substantial cause of child's alleged lead poisoning and that "of course, to establish causation, Dr. Chisolm would have to testify as to the impact of the limited exposure"). As we have noted previously, "causation evidence that is wholly speculative is not sufficient." *Dow*, 144 Md. App. at 75 (quoting *Lyon v. Campbell*, 120 Md. App. 412, 437 (1998)). This fundamental point was not contradicted in *Ross*, in which the Court acknowledged that where "the limits of the inferences in plaintiff's favor are evident, summary judgment might still be warranted." *Ross*, 430 Md. at 671. Dr. Simon's testimony is insufficient to establish medical causation.

Based on the record before this Court and making all reasonable inferences in favor of Roy, such inferences would only include that 2525 Oswego Avenue was a source of lead exposure, and that Roy's BLL peaked during his residence there. The record

31

provides no evidence to link Roy's elevated BLL with his alleged neurological injuries as exemplified through behavioral and academic deficits. Moreover, we find no reason to adopt such an assumption. Roy failed to offer sufficient evidence from which a reasonable fact-finder could reasonably infer that his injuries resulted from his exposure to lead at 2525 Oswego Avenue.

To survive the motion for summary judgment, Roy needed to present sufficient evidence that, when viewed most favorably to him, a jury could find that the house at 2525 Oswego Avenue contained lead-based paint to which Roy was exposed; that Roy's exposure to lead-based paint at the house was a substantial contributing cause of his elevated BLL; and that Roy's associated increase in BLL must have been substantial enough to cause injury. Without a medical expert in the case, neither the testimony of Dr. Simon nor the circumstantial evidence presented by Roy can sustain this burden of proof. Accordingly, the circuit court's grant of summary judgment in favor of the Dackmans was proper.

> **JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**

32